

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-1-2001

# United States v. Mustafa

Precedential or Non-Precedential:

Docket 99-1702

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Mustafa" (2001). *2001 Decisions.* Paper 18.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/18

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1702

UNITED STATES OF AMERICA

v.

MIKE MUSTAFA a/k/a
DARWISH MUSTAFA

Mike Mustafa,
Appellant

Appeal from United States District Court
for the Eastern District of Pennsylvania
Docket No. 98-cr-00609-1
District Judge: Honorable Robert F. Kelly

Argued December 5, 2000

Before: McKEE, ROSENN and CUDAHY,*
Circuit Judges.

(Opinion Filed: February 1, 2001)

        THOMAS C. EGAN III,
         ESQUIRE (Argued)
        621 Swede Street
        Norristown, Pa. 19401
Attorney for Appellant

_____
* The Honorable Richard D. Cudahy, United States Court of Appeals for
the Seventh Circuit, sitting by designation.

MICHAEL R. STILES,
 UNITED STATES ATTORNEY
MITCHELL S. GOLDBERG, (Argued)
RICHARD J. ZACK
Office of United States Attorney
615 Chestnut Street
Ste. 1250
Philadelphia, Pa. 19106-4476
Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge:

Mike Mustafa appeals following acceptance of his guilty plea. He argues that his guilty plea was not knowing, voluntary, and intelligent, and that the district court erred in relying upon the money laundering guideline in calculating his sentence. We affirm the district court's use of the money laundering sentencing guideline, and we conclude that his plea was knowing, voluntary, and intelligent. Accordingly, we deny Mustafa's r equest to withdraw his guilty plea. However, we conclude that the district court did err in not considering Mustafa's ability to pay the restitution that was imposed in the amount of $732,223. Accordingly, we will remand for resentencing proceedings consistent with this opinion.

I.

On December 8, 1998, a federal grand jury in the Eastern District of Pennsylvania retur ned a 46 count indictment charging Mike Mustafa with mail fraud, malicious destruction of a building by fir e, use of fire to commit a felony, food stamp fraud, money laundering and making false statements in obtaining a bank loan. The indictment charged that Mustafa fraudulently inflated his income in documents he had submitted to the Shar on Savings Bank to purchase and renovate a building in which he planned to operate a supermarket.

2

According to the indictment, Mustafa operated the Buy and Save Supermarket in the building he pur chased with the loan proceeds. He also obtained an insurance policy on the building and business, and he subsequently caused the building to be destroyed by a four alar m fire so that he could collect the proceeds of the insurance policy. The indictment also charged that, while he operated the supermarket, he deposited over $1.5 million worth of fraudulently obtained food stamps into an account at the Sharon Savings Bank; a bank authorized to r eceive food stamps. In order to participate in the food stamp program, Mustafa had to submit an application to the United States Department of Agriculture acknowledging that the account would be used to deposit food stamps obtained pursuant to applicable regulations and restrictions. The indictment further alleged that Mustafa completed a requir ed "redemption certificate" with each food stamp deposit. Each redemption certificate purported to verify that the food stamps Mustafa was depositing were obtained in a manner that was consistent with controlling USDA r egulations.

Mustafa originally entered a plea of not guilty and proceeded to trial. During the first thr ee days of that trial the government called 20 witnesses. The testimony included evidence of Mustafa's motive to set thefire and collect the insurance proceeds,[1] the suspicious nature of the fire, and circumstances tending to establish that only Mustafa and his brothers had access to the building, and the alarm code. The government also intr oduced the testimony of an employee who testified that Mustafa had attempted to persuade him to say that the fir e was caused by a pot of potatoes left on the stove.

The government also introduced a financial analysis of supermarket records, and testimony of witnesses regarding the food stamp fraud Mustafa was conducting fr om the

_____

1. Mustafa had over $500,000 in personal debt, and the supermarket was in serious financial trouble. Some of the income Mustafa was deriving from the supermarket was derived from a fraudulent food stamp scheme, but changes in the food stamp program itself meant that the scheme would soon end, and Mustafa's only viable asset was the insurance policy on the building and the super market business.

3

supermarket. That evidence established that Mustafa had to submit a USDA application stating that his account at Sharon Savings Bank would be used for food stamps that the supermarket received in exchange for food pursuant to USDA regulations. The government's witnesses established that Mustafa regularly purchased food stamps from persons trafficking in illegal food stamps, and that he then deposited those stamps into the Sharon Savings Bank account. Each time he made such a deposit, he had to submit a redemption certificate, confir ming that the deposited food stamps were properly r eceived in connection with the purchase and sale of groceries. When records from legitimate food stamp transactions were compar ed with the deposits to the Sharon Bank account, the evidence established that Mustafa had deposited over $1.5 million in illegal food stamps into that account.

Three days into the trial, Mustafa changed his plea pursuant to a written plea agreement. He ther eafter entered an open plea of guilty to all counts of the indictment except those related to the arson of the super market. The arson related charges were dismissed pursuant to the plea agreement. That agreement stated in part:

> Total possible maximum sentence is 830 years of incarceration, a fine of $1,260,000 plus twice the value of property involved in the money laundering scheme, and five years supervised release.
>
> The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be incr eased by the period of three years. Thus a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time alr eady spent on supervised release.
>
> ***
> ***
> ***

4

8. The defendant may not withdraw his plea because the Court declines to follow any recommendation, motion or stipulation by the parties to this agreement. No one has promised or guaranteed to the defendant what sentence the Court will impose.

***

10. It is agreed that no additional promises, agreements or conditions have been entered into other than those set forth in this document, and none will be entered into unless in writing and signed by all the parties.

Supplemental App. at 341a –343a.

On March 18, 1999, during the change of plea hearing, the government outlined the terms of the plea to the defendant in open court. The government reiterated many of the terms of the written agreement including the maximum sentences for each count Mustafa was pleading guilty to. The Assistant United States Attorney told the defendant:

> [t]he plea agreement states that the defendant may not withdraw the plea because this Court may decide to decline to follow any recommendation or stipulation by the parties.
>
> The plea also indicates that no one has promised or guaranteed Mr. Mustafa what the sentence will be, and the plea states that Mr. Mustafa is satisfied with his legal representation and that he is agreeing to plead guilty because he is in fact guilty.
>
> Lastly, the plea agreement states that no promises, agreements or conditions have been entered into other than those that I've articulated as part of the plea agreement.

App. at 40. The following exchange ensued:

> THE COURT: Could you total the –– give the total maximum?
>
> AUSA: Yes. I'm sorry. I neglected to state that. The total maximum sentence, your Honor, is 830 years

5

incarceration, a fine of $1,260,000, plus twice the value involved in the money laundering scheme, and five years of supervised release.

THE COURT: [Defense counsel], is that your

understanding of the agreement?

DEFENSE ATTORNEY: It is, sir.

THE COURT: Mr. Mustafa, is that your understanding of the agreement?

DEFENDANT MUSTAFA: Yes.

App. at 41-42.

Since Mustafa had pled guilty to 40 counts of money laundering, the district court applied U.S.S.G.S 2S1.1, the money laundering guideline, and determined that Mustafa's base offense level was 20. The district court then increased that level by five because the value of the funds was greater than $1 million but less than $2 million, see  U.S.S.G. S 2S1.1(b)(2)(F), and added an upward adjustment of two levels for obstruction of justice based on Mustafa's attempt to change testimony of a former employee, see U.S.S.G. S 3C1.1, and a three level upward adjustment based upon endangering public safety, and the extensive damage caused by the fire, see U.S.S.G.SS 5K2.14, 5K2.5. The court determined that Mustafa had not fully accepted responsibility for his crimes, and it ther efore refused to grant a reduction for acceptance of responsibility under U.S.S.G. S 3E1.1. The court calculated a criminal history category of II based upon a 1985 conviction for distribution of cocaine. That criminal history category combined with the resulting total base offense level of 30 yielded a sentencing range of 108 to 135 months. The court sentenced Mustafa to 135 months of imprisonment,five years supervised release, special assessments in the amount of $4,300, and restitution in the amount of $732,223.2 This appeal followed.

---

2. Mustafa objected to the PSI on several factual grounds, however, he did not object to the application of the money laundering guidelines.

II.

Mustafa raises numerous issues on appeal.3 However, we conclude that only three of his assertions merit discussion. Accordingly, we will limit our discussion to: 1) the voluntariness of the guilty plea, 2) the application of the money laundering guideline, and 3) whether the district court erred by failing to inquire into Mustafa's ability to pay the restitution that was imposed. In all other respects, the district court's judgment is affirmed without further discussion.

A.

Although Mustafa now seeks to withdraw his guilty plea, he never moved to withdraw the plea in the district court, nor did he object to any portion of the Rule 11 change of plea colloquy. He now alleges that the district court failed to comply with the requirements of Fed. R. Crim. P. 11, and that the error was not harmless.4 See United States v. DeLe Puente, 755 F.2d 313,314 (1985).

_____

3. He argues that his guilty plea was not knowing, voluntary and intelligent, and should therefore be withdrawn. He also claims that the district court erred in each of the following r espects: applying the money
laundering guideline to his conviction, imposing a sentence outside of the "applicable guideline range on the loan fraud count," upwardly adjusting the sentence for obstruction of justice, applying an enhancement under U.S.S.G. SS 5K2.4 and 5K2.14, calculating the amount of loss for the food stamp fraud, failing to give a downward adjustment for acceptance of responsibility, failing to adjust his sentence
for "family and his tremendous civic involvement," and failing to inquire into his ability to pay restitution "in excess of $700,000." See Appellant's
Br. at 3.

Initially counsel also challenged the district court's failure to advise of
the affect of special parole. However , at oral argument, he conceded that argument was without merit. We agr ee. Although the Rule 11 colloquy here does not contain an explanation of what could happen if Mustafa violated supervised release or special par ole, it does show that Mustafa was informed that the maximum sentence was 830 years imprisonment and a maximum term of five years supervised release. App. 39-41. His sentence of 135 months imprisonment plus five years supervised release is far less than the maximum that was explained to him. See United States v. Electrodyne Systems, 147 F . 3d 250 (3d Cir. 1998).

4. Federal Rule of Criminal Procedur e 11(h) provides:

(h) Harmless Error. Any variance from the procedures required by

7

Mustafa's request to withdraw his guilty plea is based upon his contention that the court failed to infor m him that restitution could be ordered as part of the sentence, and the court's failure to inquire into the pr omises that Mustafa said had been made outside the change of plea hearing. He also argues that his plea should be withdrawn because he received ineffective assistance of counsel before pleading guilty.

Federal Rule of Criminal Procedure 11(1)(c) provides:

> (c) Advice to Defendant. Before accepting a plea of guilty . . . the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
>
> (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special par ole or supervised release term, the fact that the court is required to consider any applicable sentencing guidelines but may depart from those guidelines under some circumstances, and, when applicable, that the court may also order the defendant to make r estitution to any victim of the offense.

Fed. R. Crim. P. 11(c)(1) (emphasis added).

Mustafa correctly asserts that the word"restitution" was never used during the change of plea colloquy. The government did inform Mustafa that he could be fined $1,260,000 plus twice the amount involved in the money laundering scheme. However, as Mustafa points out, restitution is not the same as a fine. A criminal fine is a form of punishment, whereas restitution is merely intended to compensate the victim. United States v. Edwar ds, 162 F.3d 87, 91–92 (3d Cir. 1988). Nevertheless, although this
_____

> this rule which does not effect substantial rights shall be disregarded.

Fed. R. Crim. P. 11(h).

8

distinction is real, it is irrelevant her e. See United States v. Electrodyne Systems, 147 F.3d 250 (3d Cir. 1998).

In Electrodyne Systems, the district court erred in advising the defendant of the correct statutoryfine on one of the counts he pled guilty to. Id. at 252. The defendant was, however, properly advised of the total maximum fine that could be imposed on a second count that he also pled guilty to. The total fine that was imposed was less than the stated maximum on that latter count. We held that the court's error as to the amount of the fine that could be imposed on the first count was harmless. W e concluded:

> [w]hen all is said and done, the immutable fact is that [the defendant] was advised its maximum fine exposure was $1,010,000, when in fact the maximum fine exposure was $1,500,000, Defendant was fined $1 million, an amount below the exposure about which it was informed. Under this circumstance, the error must be characterized as harmless.

Id. at 253.

Here, Mustafa was advised that he faced a fine of several million dollars but was actually ordered to pay far less than that amount in restitution. However , he clearly was informed of the potential financial exposur e that his plea subjected him to, and the amount he was order ed to pay was far less than the maximum that he could have been ordered to pay. Accordingly, despite the technical distinction between a fine and restitution, no substantial rights were affected by the district court's failure to specifically mention restitution or infor m Mustafa that he could be ordered to compensate the victims for any financial loss. Thus, the error was har mless.

B.

In his brief before us, Mustafa argues that his plea was not voluntary because when the court asked him whether other promises had been made, he answer ed, "yes," and the court never inquired further. Rule 11(d) provides in pertinent part:

Insuring That the Plea is Voluntary. The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the government and the defendant or the defendant's attorney.

Fed.R.Crim.P. 11(d) (emphasis added).

As noted above, during the change of plea pr oceeding, the Assistant United States Attorney r ead the plea agreement to the court, Mustafa, and his attor ney. The court then asked defense counsel, "is that your understanding of the agreement," and counsel responded: "It is, sir." App. at 41. The court then asked the same question of Mustafa, and he answered, "Y es." Id. The court and Mustafa then had the following exchange:

> THE COURT: Do you think any other promises have been made to you?
>
> DEFENDANT MUSTAFA: Except what they said right here.
>
> THE COURT: In open court her e?
>
> DEFENDANT MUSTAFA: Yes.

Id. There was no further inquiry by the court, counsel, or the government, and that "omission" is the basis of part of Mustafa's attack on the Rule 11 colloquy. However , the court's failure to inquire further must be viewed in context with the entire colloquy. Prior to the exchange that we have set forth above, the Assistant United States Attor ney advised the court and Mustafa that:

> [t]he plea agreement states that the defendant may not withdraw the plea because this Court may decide to decline to follow any recommendation or stipulation by the parties.
>
> The plea also indicates that no one has pr omised or guaranteed Mr. Mustafa what the sentence will be, and

10

> the plea states that Mr. Mustafa is satisfied with his legal representation and that he is agr eeing to plead guilty because he is in fact guilty.

Id. at 40 (emphasis added). In addition, immediately after Mustafa suggested that other promises had been made, his attorney stated:

> I should add for the record, your Honor , that I've also consulted with my client concerning the Sentencing Guidelines and their applicability here.
> I don't know if I spoke too soon, if the Court was going to get to that, but in answering the Court's question, we have gone over the Guidelines, and I've told him what my understanding of those Guidelines are befor e entering the plea.

Id. at 42 (emphasis added). The judge then asked Mustafa if he had any questions "of me about what you'r e doing[ ]" and Mustafa answered, "[n]o, sir ." Id.

Thus, the only reasonable conclusion that this record supports is that Mustafa had been advised of counsel's best estimate of what the court would actually impose, and Mustafa was interpreting counsel's estimate as a "promise" as to the sentence he was going to receive. Mustafa said absolutely nothing after his attorney infor med the court of guidelines discussions, and he never said anything to suggest that his affirmative response about other promises was anything more than a reference to"assurances" he had received from his attorney as to what sentence would most likely be imposed.

Mustafa was told that the total maximum sentence was 830 years of imprisonment. The sentence of imprisonment he received, though substantial (135 months), was far less than the maximum that he was aware of. Mor eover, any alleged misrepresentations that Mustafa's former counsel may have made regarding sentencing calculations were dispelled when Mustafa was informed in open court that there were no guarantees as to sentence, and that the court could sentence him to the maximum. Thus, we conclude

11

that Mustafa's answering "yes" to the court's inquiry about promises is not grounds to invalidate his plea.5

C.

Mustafa argues that the district court err oneously used the guideline for money laundering, U.S.S.G. S 2S1.1, to calculate his sentence. Since he did not object to using that guideline at sentencing, we review this claim only for plain error. United States v. Cefaratti , 221 F.3d 502, 512 (3d Cir. 2000) (citing United States v. Knobloch, 131 F.3d 366,370 (3d Cir. 1997)).

In United States v. Smith, 186 F.3d 290 (3rd Cir. 1999) we explained the proper inquiry for deter mining when U.S.S.G. S 2S1.1 applies. There, the defendants had been convicted of 15 counts of money laundering arising out of an embezzlement/kickback scheme. Id. at 293. The scheme involved Smith diverting numerous corporate checks to his own creditors for the announced purpose of securing the services of various lobbyists. The sentencing judge sentenced the defendants pursuant to U.S.S.G. S 2S1.1, and they argued that was error. Id. at 297.

In reversing, we began by explaining that:

> In determining sentences, courts consult the Statutory Index, Appendix A to the Guidelines Manual for a list of guidelines that correspond to the statute of conviction. See U.S.S.G. S 1B1.2(a) and App. Note 1. If, however, `in an atypical case,' the guideline indicated for the statute of conviction is `inappropriate because of the particular conduct involved,' the court is instructed to use the guideline `most applicable to the

---

5. We recognize that the maximum sentence authorized by law is often so extraordinarily long that few defendants other than "career criminals" plead guilty with the expectation that the maximum sentence applies to them. However, all that the law requir es is that the defendant be informed of his/her exposure in pleading guilty. The law does not require that a defendant be given a reasonably accurate"best guess" as to what his/her actual sentence will be; nor could it, given the vagaries and variables of each defendant's circumstances and offending behavior. See United States v. Clearly, 46 F. 3d 307, 311 (3rd Cir. 1995).

12

nature of the offense conduct char ged.' Appendix A at 417 (Introduction).

Appendix A sets up a two-step inquiry:

1. Does the designated guideline apply or is the conduct `atypical' in comparison to that usually punished by the statute of conviction; and

2. If the conduct is `atypical' which guideline is more appropriate?

Id. We also offered the following guidance:

In making its selection, the sentencing court must determine if the conduct being punished falls within the particular guideline's heartland, a set of typical cases embodying the conduct described in each guideline.

Id. at 297-98 (internal quotations omitted). Inasmuch as the money laundering statutes had only recently been enacted when S 2S1.1 became effective, and the statutes did not have the extensive history of other federal crimes, we focused on the statements of the Commission itself to assist in determining if a given offense fell within the statute's "heartland." Id. at 298. W e stated,

[f]or that reason the Commission chose a high offense level to punish the activity which had aroused congressional concern: 1) situations in which the laundered funds derived from serious underlying criminal conduct such as significant drug trafficking operation or organized crime; and 2) situations in which the financial transaction was separate fr om the underlying crime and was undertaken to either: a) make it appear that the funds were legitimate, or b) promote additional criminal conduct by r einvesting the funds in additional criminal conduct.

Id. (citing United States Sentencing Commission, Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report at 3 & n.2 (Sept. 18 1997) (internal quotations omitted).

13

We also noted that U.S.S.G. S 2S1.1 had been criticized because it resulted in "sentences for money laundering offenses [that] were substantially greater than sentences established for the less serious crimes that pr oduced the laundered proceeds (e.g., minor fraud)." Id. (quoting United States Sentencing Commission, Report to the Congr ess: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report at 3 & n.2 (Sept. 18 1997)). We observed that the Commission appeared to respond to this criticism by proposing amendments directed at " `both the seriousness of the underlying criminal conduct,' and to `the natur e and seriousness of the laundering conduct itself.' " Id. at 299 (citing United States v. Woods, 159 F .3d 1132, 1135 (8th Cir. 1998). However, Congress did not approve the changes because of its concern that doing so would send the wrong message. Id. Nevertheless, the House Report did acknowledge that:

> the application of the current guidelines to r eceipt-and-deposit cases, as well as to certain other cases that do not involve aggravated money laundering activity, may be problematic. Nevertheless, past sentencing anomalies arising from relatively few cases do not justify a sweeping downward adjustment in the money laundering guidelines.

Id. (quoting H.R.Rep. No. 104-272, at 14-15, reprinted in 1995 U.S.C.C.A.N. 335, 348-49) (internal quotations omitted). We inferred that the House Judiciary Committee meant for resolution of these "anomalies" to be left up to the courts. Id. (citing Woods, 159 F.3d at 1135). Accordingly, we concluded that "the Sentencing Commission itself has indicated that the heartland of U.S.S.G. S 2S1.1 is the money laundering activity connected with extensive drug trafficking and serious crime." Id. at 300.

That "heartland" conduct was not, however , present in Smith's case. The money laundering there was based solely on the 15 checks sent to Smith's creditors, and Smith's conduct left a "paper trail" that was the antithesis of any claim of planned concealment. Id. (citing United States v.

14

Caba, 911 F.Supp. 630, 636 (E.D.N.Y .), aff 'd, 104 F.3d 354 (2d Cir. 1996)). We stated:

> The money laundering activity, when evaluated against the entire course of conduct, was an `incidental by-product' of the kickback scheme. The root of defendant's activity in this case was the fraud . . .
>
> * * *
>
> To use the money laundering guideline in this routine fraud case would let the `tail wag the dog.'

Id. (citations omitted).

We concluded by finding that the Commission's "overarching directive" is "to match the guideline to the offense conduct which formed the basis of the underlying conviction," and held that Smith's case "pr esents one of those anomalies that Congress intended the courts to deal with fairly." Id.

In United States v. Cefaratti, we applied the reasoning of Smith. 221 F.3d 502, 513-15 (3d Cir . 2000). There, Cefaratti pled guilty to mail fraud, student loan fraud, and money laundering. Id. at 504. Cefaratti owned a beauty school that participated in federal student financial assistance programs. Id. at 505. The school was authorized to act as a dispensing agent for federally funded Pell grants, and it also received Stafford loan checks. Id. Before the latter could be deposited into the school's account, the checks had to be endorsed by both the student and a representative of the school. Id.

Pursuant to DOE regulations, a school could lose its eligibility to participate in federal student assistance programs if its students had an excessive default rate on their student loans. Id. The default rate at the defendant's school was so high that it would have jeopar dized its ability to receive these federal funds.

In order to preserve the flow of the pr oceeds from student loans despite a poor default rate, Cefaratti manipulated the default rate by advancing false deferment and forbearance forms to lenders and by making payments on behalf of students who were on the brink of default. Id. The loan

15

checks at issue were mailed to the school and made payable to the student and the school. Id. at 511. As a result, the school received over $840,000 in federal funds that it would not otherwise have received because of its poor default rate. Id. at 506.

On appeal, Cefaratti relied on our holding in Smith and argued that the sentencing court should not have applied the money laundering guideline in calculating his sentence because his case was "little more than r outine fraud to which the money laundering was incidental" Id . at 514. He insisted that his conduct was the kind of routine "receipt-and-deposit" anomaly that was not intended to be sentenced as money laundering because it "did not involve large scale drug trafficking or organized crime," Id. at 512, and was not the proper focus of S 2S1.1 under Smith. We rejected Cefaratti's argument, and explained that Smith did not depart from prior cases involving conduct similar to Cefaratti's.6 Id. W e stated:

> We read Smith, in conjunction with our prior cases, to
> stand for the unremarkable principle that in certain

_____

6. See, e.g., United States v. Morelli, 169 F.3d 798, 809 n. 13 (3d Cir. 1999) (sentencing under S 2S1.1; proceeds of scheme to embezzle excise taxes on fuel sales laundered by wiring funds between companies controlled by defendants); United States v. Cocivera, 104 F.3d 566, 570 n. 2 (3d Cir. 1996) (summarily rejecting argument that S 2F1.1 rather than S 2S1.2 should have been applied wher e defendant who had committed medicare fraud and other crimes was also convicted of 22 counts under S 1957); United States v. Conley, 92 F.3d 157, 162–63 (3d Cir. 1996) (sentencing under S 2S1.1; defendant convicted of running illegal gambling scheme and conspiring to do the same and to launder the proceeds); United States v. Sokolow, 91 F.3d 396, 410–13 (3d Cir. 1996) (defendant sentenced under S 2S1.2 for , inter alia, misrepresenting the nature of his benefits plan and defrauding plan members of insurance premiums; indictment alleged defendant laundered funds through a series of accounts, property, and mortgages); United States v. Thompson, 40 F.3d 48, 50 (3d Cir. 1994) (defendants who intercepted and diverted funds mailed to securities fir m sentenced under S 2S1.1); United States v. Cusumano, 943 F.2d 305, 312–14 (3d Cir. 1991) (sentencing under S 2S1.1 where underlying conduct was embezzlement/kickback scheme involving employee benefit plan; rejecting argument that "core" offense of conviction was kickback scheme rather than money laundering).

16

cases `strict focus on the technicalities of the sentencing process obscures the overar ching directive to match the guideline to the offense conduct . . .' In Smith, the overarching offense conduct was `routine fraud,' and the money laundering, though technically a violation of S 1956, was merely an `incidental by product' of that fraud.

Id. at 514 (citations omitted). In r ejecting Cefaratti's contention that the money laundering guideline did not apply to his "garden variety" fraud we stated:

To be sure, the deposit of the fraudulently-obtained Stafford loan checks can be characterized in this manner. However, in Smith we emphasized the concern of Congress and the Sentencing Commission with separate financial transactions undertaken to legitimize illegally-obtained funds or to promote additional criminal conduct. The evidence in this case demonstrates that Cefaratti used the proceeds of his mail and wir e fraud to promote further acts of fraud.

Id. at 514-15 (citations omitted) (emphasis added). Accordingly, we refused to view his case as merely one of receipt-and-deposit of fraudulently obtained funds, and concluded that the district court had not committed plain error in sentencing Cefaratti under that guideline.

Recently, we again applied Smith in United States v. Bockius, 228 F.3d 305 (3rd Cir . 2000). There, Bockius pleaded guilty to wire fraud and money laundering. Id. at 308. At sentencing, Bockius objected to the pr osecution's attempt to have the court apply the money laundering guideline, and the district court agreed. The court concluded that Bockius' conduct did not fall within the heartland of S 2S1.1 under Smith, and refused to apply that guideline. The government appealed. In defending the district court's refusal to rely uponS 2S1.1, Bockius argued that the district court correctly deter mined that his conduct fell outside the heartland of the money laundering guideline. We disagreed. We r eversed and remanded for application of the money laundering guideline stating:

Smith makes clear that a court's S 2S1.1 heartland analysis should address whether defendants engaged

17

> in money laundering in which the laundered funds
> derived from serious underlying criminal conduct such
> as a significant drug trafficking operation or organized
> crime or in typical money laundering in which a
> defendant knowingly conducted a financial transaction
> to conceal tainted funds or funnel them into additional
> criminal conduct.

Id. at 312 (internal quotation marks omitted) (emphasis added). Bockius' conviction stemmed from embezzling funds in an escrow account and his subsequent attempt to funnel those funds into dummy corporations in the Cayman Islands, and foreign bank accounts. W e instructed the district court as follows:

> [a]s noted in Smith, on remand the District Court
> should engage in a heartland analysis before applying
> the money laundering guideline. Where money
> laundering is not "minimal or incidental," and is
> "separate from the underlying crime" and intended to
> "make it appear that the funds were legitimate" or to
> funnel the money into further criminal activities,
> S 2S1.1 is an applicable guideline. The guideline may
> also be applicable if there is evidence that the activities
> which fulfilled the broad statutory r equirements for
> money laundering were connected with extensive drug
> trafficking or other serious crime.

Id. at 313 (emphasis added).

Bockius' conduct was clearly more akin to traditional notions of money laundering than the conduct Mustafa engaged in here. Nevertheless, Mustafa pled guilty to 40 counts of money laundering in violation of 18 U.S.C. S 1956(a) (1)(B)(i). He thereby admitted engaging in conduct that involved deposits of over $1.5 million that wer e intended to disguise the source and natur e of the proceeds of his fraudulent activity. Each of those deposits was separate and distinct from the criminal activity they were derived from. Moreover, in making each of the numerous deposits, Mustafa necessarily represented to the bank and the U.S. Department of Agriculture that he had received food stamps in a legitimate manner (in exchange for food), and his conduct was therefore intended to create an

18

appearance that the illegally obtained proceeds were legitimate. Of course, Mustafa needed to do this because the food stamps were of no use to him unless they were converted to cash. However, that does not negate the fact that he was concealing the original source of the funds, and he clearly intended to effectuate that concealment.

Accordingly, we can not find that it was plain error for the district court to conclude that the financial transactions were separate from the underlying crime of food stamp fraud, or that the deposits were intended to make it appear that the food stamps were legitimate.[7] Therefore, we will not reverse the district court's application of U.S.S.G. S 2S1.1.[8]

Before discussing Mustafa's next allegation of error, we need to mention one final point. The United States Sentencing Commission amended the guidelines, ef fective November 1, 2000. Sections 1B1.1 and 1B1.2 wer e amended as well as Appendix A's introduction. Appendix A's introductory comments, as amended, omit language that we relied on in Smith. See Smith, 186 F.3d at 297 (referring to Appendix A's reference to "atypical" cases). The Sentencing Commission's statement of its "Reason for Amendment" reveals that these amendments wer e "intended to emphasize that the sentencing court must apply the offense guideline refer enced in the Statutory Index for the statute of conviction," and specifically cites our opinion in Smith. U.S. Sentencing Guidelines Manual app.C at 32 (Supp. 2000) (emphasis added).

Given these amendments, the continued relevance of Smith is open to question. Here, Mustafa was sentenced on September 3, 1999. Therefore, whether the sentencing

_____

7. The government does not argue that Mustafa deposited the food stamps in order to reinvest the funds in additional criminal conduct.

8. We are not unmindful of the abuse that can occur when the government relies upon the money laundering guideline to reflexively ratchet up penalties by stapling the money laundering guideline to the ultimate realization of financial gain that is the goal of nearly all criminal
schemes. Here, however, Mustafa admitted money laundering and the conduct supporting his guilty plea involved converting vast amounts of food coupons into cash. Accordingly, the district court did not commit plain error in finding his conduct within the heartland of this guideline.

19

court was bound by the subsequent amendment depends on whether the amendment is a clarifying amendment or a substantive change to the guidelines. United States v. Roberson, 194 F.3d 408, 417(3d Cir . 1999) (explaining that "substantive amendments –– in contrast to clarifying amendments–– are not given retroactive effect"). The amendment directs the sentencing court to focus on the offense of conviction and apply the "applicable" guideline as determined by the Statutory Index in Appendix A without conducting the heartland analysis we requir ed under Smith. If the amendment applies to Mustafa's sentence (i.e. if it was merely a "clarifying" amendment), the money laundering guideline clearly controlled, and was properly applied. That is the applicable guideline for Mustafa's conduct under the Statutory Index in Appendix A, and Smith's heartland analysis would have been impr oper. On the other hand, if the amendment constituted a substantive change in the law, it could not be applied r etroactively to Mustafa's sentence, and Smith and its pr ogeny would still require the analysis we have conducted above. Accordingly, we need not determine if the amendment was a substantive change in the law because, under either scenario, application of the money laundering guideline her e can not rise to the level of plain error.

III.

Mustafa claims that his plea should be withdrawn because his attorney rendered constitutionally ineffective assistance. However, claims of ineffective assistance of counsel are generally not cognizable on dir ect appeal. United States v. Tobin, 155 F.3d 636, 643 (3d Cir. 1998). The proper device for challenging assistance of counsel is a motion under 28 U.S.C. S 2255. Accordingly, we will not address this issue now. Mustafa can attempt to raise this claim in a properly filed petition underS 2255.

IV.

Lastly, Mustafa argues that the district court erred by never inquiring into his ability to pay the amount of restitution that was ordered. Our r eview of the record

20

confirms that the court did fail to conduct an adequate inquiry into Mustafa's ability to pay as requir ed under 18 U.S.C. S 3664 (f)(2), See United States v. Coates, 178 F.3d 681 (3d cir. 1999), and the government has conceded this error. To its credit, the government states that "the restitution order should be vacated and sentencing remanded for the sole purpose of allowing the court to access Mustafa's financial resources before re-ordering restitution." Government's Br. at 21. We agree, and we will remand for resentencing limited to the issue of Mustafa's ability to pay. Of course, the district court will be free to order restitution in an appropriate amount after conducting an appropriate inquiry.

V.

For the above reasons, we will affirm the judgment of the district court except for the order of r estitution. The order of restitution will be vacated, and we will r emand for further proceedings to determine the amount of restitution, if any, that Mustafa should be ordered to pay.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit