**UNITED STATES of America**

v.

**Nabil SIDHOM, Defendant.**

**No. CR. 98–10289–EFH.**

United States District Court,
D.Massachusetts.

April 26, 2001.

Anthony M. Cardinale, Boston, MA, for Nabil Sidhom, defendant.

Mark W. Pearlstein, Allison D. Borroughs, U.S. Attorney's Office, Boston, MA, for U.S.

### *MEMORANDUM AND ORDER*

HARRINGTON, Senior District Judge.

#### *Background*

Defendant Nabil Sidhom was convicted by a jury of two counts of money laundering in violation of 18 U.S.C. § 1956(a)(3). The defendant now asks this Court to grant a motion for a downward departure from the Sentencing Guidelines based on the theory that the transactions for which he was convicted fall outside of the "heartland" of the type of conduct punished in the typical money laundering case.[1] After considering the evidence at

---

1. Defendant also claims that he is eligible, based on a combination of U.S.S.G. §§ 5K2.1 (victim's conduct) and 5K2.12 (coercion and duress), for a downward departure on the

trial, and after conducting a pre-sentencing evidentiary hearing, the Court now makes the following factual findings and conclusions of law.[2]

### Factual Findings

At the time leading up to the transactions in question, the Defendant Nabil Sidhom had been involved in the lawful business of check cashing. Known as American Check Cashing, the defendant had conducted this business for many years from a location in Brockton, Massachusetts. Among the customers of American Check Cashing was a certain Rafael Tejada. Unbeknownst to the defendant, Tejada had been a long time confidential informant of various state and federal law enforcement agencies. For his work in various investigations, Tejada has received from the government both financial compensation, as well as protection from a 1991 deportation order.

Prior to May of 1998, Tejada used the services of American Check Cashing in cashing his personal checks on a regular basis. During this time, he developed a friendship with Nabil Sidhom, the employee of American Check Cashing with whom he frequently dealt. The relationship between Tejada and the defendant was such that Tejada spoke to the defendant about a friend of his from Florida who needed money to be sent down to Florida from Brockton.

During a May 15, 1998 conversation between the two, in which Tejada came equipped with a concealed electronic recording device, the topic of discussion turned to Tejada's wife.[3] The defendant inquired about the condition of Tejada's wife to which he replied that she had recently been visiting her father in the hospital when she fell off the stairs and broke bones in her foot and a finger. Tejada then explained that this occurrence had compelled him to stay at home more than usual. The conversation that was recorded on May 15, 1998, taken in conjunction with the other evidence in the record, circumstantially establishes that there had been previous, unrecorded, conversations between Tejada and the defendant where the subject of Tejada's wife, her health, and his economic condition had indeed arisen. Tejada did testify at the evidentiary hearing that, prior to May 15, 1998, he had told the defendant about his friend from Florida and during those conversations he had spoken about his wife being ill and in a hospital. The evidence establishing the fact that Tejada had previously made the defendant aware of these matters is supported by the logical inference that a conversation such as the one that took place on May 15, 1998, concerning matters personal to Tejada, would not

theory of "imperfect entrapment." After reviewing the facts of this case and the determinations made by the jury, the Court denies defendant's request for a departure on this ground.

**2.** The Defendant Sidhom has submitted an affidavit in conjunction with his motion for a downward departure. The affidavit of Sidhom sets forth certain factual allegations concerning the circumstances surrounding the two transactions. As the government has noted, since the defendant has not taken the stand, at either the trial or evidentiary hearing, and opened himself up to cross-examination, it is not proper for the Court to use the affidavit as a basis for its factual conclusions. Rather, the Court relies upon the testimony and exhibits introduced at both the trial and the evidentiary hearing, which includes the transcripts of the recorded conversations between the informant, Rafael Tejada, and the defendant, as well as the evidentiary hearing testimony of Tejada.

**3.** The record indicates that Tejada spoke to the defendant between the last time he cashed a check, February 3, 1998, and the date of the first taped conversation of May 15, 1998.

have taken place without some previous conversations on the subject.

The taped conversation of May 15, 1998 also contained an exchange in which Tejada told the defendant that he had assured his acquaintance in Florida that he had a good friend who would take care of him and that if the defendant took care of Tejada's out-of-state friend, it would be like taking care of Tejada himself. The next recorded conversation, which took place on May 21, 1998, after the defendant had been introduced to the undercover state police officer whom Tejada had brought to American Check Cashing, also included language indicating that the defendant was motivated by the desire to assist Tejada in resolving his personal and financial difficulties. It was on May 21st that the first money laundering transaction took place. It was at this time that it was purported by Tejada that the money to be laundered was drug related. Notwithstanding this assertion, the substance of the two conversations recorded in May of 1998, coupled with the evaluation of the credibility of Tejada's testimony at the evidentiary hearing, establishes that Tejada was requesting the defendant to do him a favor by assisting his friend and the defendant so obliged him. The fact that the defendant refused several times on May 21, 1998 to accept the money offered by the undercover police officer for the transaction further establishes that the defendant was involved in the money laundering transactions not primarily for the purpose of making money, but rather as a personal favor to Tejada.

During the next recorded conversation, on June 9, 1998, the discussion between the defendant and Tejada turned to the subject of compensation for the defendant's efforts. Tejada was surprised that the defendant had not charged his friend a percentage of the transaction as a means of repaying the defendant for his efforts. According to Tejada's testimony, it is his experience that when an individual is laundering money for a drug dealer, the individual usually asks for a percentage of the money he is assisting the drug dealer to launder. It was this customary practice that led Tejada to ask the defendant during the June 9th conversation why the defendant had not charged such a percentage for the May 21st transaction. Tejada testified at the hearing that he understood from the June 9th conversation that the defendant became involved in the money laundering effort of May 21, 1998 so that Tejada, not the defendant, could make the profit.

The second money laundering transaction took place on June 18, 1998.[4] Once again present at this transaction were both Tejada and the undercover state trooper. The evidence in the record establishes that, as with the first transaction, the defendant undertook the money laundering as a favor to Tejada, a transaction which he expected would result in an economic benefit to Tejada and not to himself. The evidence which most clearly establishes this conclusion is the fact that the undercover agent present at the June 18th transaction had to force upon the defendant five hundred dollars as payment for the services he performed, which the defendant reluctantly took.

These two isolated transactions were not part of a continuing, extensive or voluminous illegal money laundering business on the part of the defendant. Rather, they were the product of a so-called "sting oper-

---

4. While the May 21st transaction of $18,000 involved the use of "moneygrams," the June 18th transaction involved the changing by the defendant of approximately $33,000 in small bills into one-hundred dollar bills.

ation." As such, the money laundered as a result of these two isolated transactions was neither drug money, nor money which came from any other underlying illegal source, but rather was "bait" money provided by the Massachusetts State Police.

### Analysis

#### A. The Standard for A Guideline Departure

■ The central question which this Court must address in evaluating whether the defendant is entitled to a downward departure is whether two money laundering transactions, conducted not as part of an on-going illegal enterprise, but rather as a personal favor to an acquaintance in need, is the type of conduct which falls within the "heartland" of money laundering cases contemplated by the Sentencing Guidelines.[5] While intended to create uniformity in sentencing, the Guidelines do allow a court to depart from the applicable guideline range when there exists a mitigating circumstance of a kind not adequately taken into consideration by the Sentencing Commission or, conversely, when a factor considered by the Guidelines is present to a degree substantially in excess of that which ordinarily is involved in the offense. See U.S.S.G.Ch. I, Pt. A, intro comment (4)(b); United States v. Jackson, 30 F.3d 199, 201 (1st Cir.1994); United States v. Skinner, 946 F.2d 176, 179 (2d Cir.1991) (emphasizing the ability of a sentencing court to downwardly depart from the guidelines where mitigating circumstances were not adequately taken into consideration by the Sentencing Commission or where atypical conduct significantly differs from the norm).

■ Under the structure adopted by the Commission, each guideline carves out a "heartland" of conduct associated with a particular offense. The term heartland refers to the set of typical cases which embody the usual pattern of conduct described by a given guideline. See U.S.S.G.Ch. I, Pt. A, intro comment (4)(b). While departures from the guidelines are appropriate in only a limited number of circumstances, a court may grant a motion for a downward departure when confronted with an atypical case. See Jackson, 30 F.3d at 201; Skinner, 946 F.2d at 179.

■ In considering whether a departure is appropriate, this Court reviews the following factors: (1) what features of a case take it outside of the Guidelines' heartland and make it special, or unusual; (2) has the Commission forbidden departures based on those features; (3) if not, has the Commission encouraged departures based on those features; or (4) has the Commission discouraged departures based on those features? See Koon v. United States, 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); United States v. Williams, 891 F.2d 962, 967 (1st Cir.1989). The conduct of the defendant in the instant case makes the matter before the Court special or unusual with regard to the features surrounding the typical money laundering offenses. In addition, since a departure in this case appears to be consistent with the dictates of the Commission, allowing the defendant's motion would be in accordance with the direction given by Koon. See 518 U.S. at 95, 116 S.Ct. 2035.

#### B. The Heartland of the Money Laundering Guideline

■ In the First Circuit, the determination of what constitutes the "heartland" of

---

5. A sentencing court may be required to perform a heartland analysis regarding a particular provision of the Sentencing Guidelines during the initial choice of the appropriate guideline, or in the context of a departure request. Although these situations arise at different stages of the sentencing process, the heartland analysis remains identical. See United States v. Smith, 186 F.3d 290, 298 (3d Cir.1999).

the money laundering sentencing guideline is linked to a determination of the nature of the crime of money laundering.[6] *See* 18 U.S.C. § 1956; *United States v. LeBlanc,* 24 F.3d 340, 346 (1st Cir.1994). In under- going this analysis, both the language of the statute and its legislative history must be taken into account.

The legislative history associated with 18 U.S.C. § 1956 indicates that Congress designed the statute to fill the gap in the criminal code with respect to the post- crime hiding of illegally procured gains. *See LeBlanc,* 24 F.3d at 346. As such, the intent was to make money laundering a separate crime, distinct from the underly- ing offense that generated the money. *See id.; United States v. Johnson,* 971 F.2d 562, 569 (10th Cir.1992).

The "typical" money laundering case oc- curs when a drug dealer collects large amounts of cash derived from large scale drug sales and, acting with the help of a person associated with a financial institu- tion, deposits the proceeds of his illegal activity under the false pretense of a legiti- mate business transaction. *See LeBlanc,* 24 F.3d at 346; *Johnson,* 971 F.2d at 568. In accordance with this view, the Court of Appeals for the Third Circuit, in *United States v. Smith,* 186 F.3d 290, 298 (3d Cir.1999), recently defined the heartland of the money laundering guideline as that activity connected with extensive drug trafficking and serious crime.

■ To support this conclusion, the Court of Appeals for the Third Circuit undertook a detailed analysis of the unique history of U.S.S.G. § 2S1.1. As the Court in *Smith* suggests, the guideline's heavy penalty structure was addressed to the criminal activity outlined in the legislative history—the money laundering associated with large scale drug activity and serious crime. *See id.* Therefore, given the spe- cific calculations of the Commission, the primary focus for a heartland determina- tion in this context should be the guideline itself, with the money laundering statute and its accompanying legislative history serving as a reference point. *See Le- Blanc,* 24 F.3d at 346; *Smith,* 186 F.3d at 298. The guideline, because of its more focused determinations, enumerates the specific conduct to be punished in a man- ner more precise than does the general statutory structure and legislative history. During this inquiry, a court in determining the heartland of the money laundering guideline is aided to a large extent by the analysis which the Sentencing Commission itself has undertaken on the subject. *See* United States Sentencing Commission Re- port to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Re- port (Sept. 18, 1997).

At the outset, the Commission chose a high offense level to punish the illegal conduct which drew Congressional atten- tion. The focus was on punishing: (1) situations in which the laundered funds derived from serious underlying criminal conduct, such as extensive drug trafficking or organized crime; and (2) situations in which the financial transaction was sepa- rate from the underlying crime and was

---

**6.** At their heart, the Guidelines are an en- forcement mechanism for the given statutory crimes. While a determination of the charac- teristics of a particular money laundering of- fense is a prerequisite to the consideration of a heartland analysis, the two steps are dis- tinct. It is, of course, possible that a particu- lar instance of money laundering will fall within the conduct prescribed to be forbidden by Congress, yet will be outside of the heart- land of the Sentencing Guidelines because such conduct did not adhere to the typical course of conduct followed by those whose actions were meant to be encompassed by the money laundering statute. *See Smith,* 186 F.3d at 298.

undertaken to either: (a) make it appear that the funds were legitimate; or (b) promote additional criminal conduct by reinvesting the funds in an additional criminal enterprise. *See id.* at 4. The unexpectedly broad application of 18 U.S.C. § 1956 led to a system which compelled sentences imposed for money laundering offenses substantially greater than those for the very serious crimes which produced the laundered proceeds. *See id.* As a result, the Commission, in 1995, proposed to Congress amendments to the money laundering guidelines. These changes sought to provide penalties more consistent with both the seriousness of the underlying criminal conduct, as well as the nature and seriousness of the money laundering conduct itself. *See Smith,* 186 F.3d at 299; *United States v. Woods,* 159 F.3d 1132, 1135 (8th Cir.1998).

Congress did not adopt the amendments proposed by the Commission. Its chief concern was that such a proposal would be perceived as sending a signal that the crime of money laundering was not considered to be as serious as it was at the Guidelines' inception. *See* H.R.Rep. No. 104–272 at 14–15 *reprinted in* 1995 U.S.C.C.A.N. 335, 348–49. While the House Report did not believe that anomalies arising from a few cases justified a sweeping downward departure in the money laundering guidelines, it did recognize the potential trouble with the application of the current guidelines to standard receipt-and-deposit cases not involving aggravated circumstances. *See id.* at 348–49. The comments of the House Judiciary Committee seem to indicate that such anomalous cases should be controlled by the courts. *See Smith,* 186 F.3d at 299; *Woods,* 159 F.3d at 1135.[7]

■ The First Circuit has had a view consistent with the Third Circuit's most recent detailed treatment of the money laundering guideline.[8] *See United States v. Pierro,* 32 F.3d 611, 619–20 (1st Cir. 1994). Given this authority, as well as the legislative history and the pronouncements of the Commission, the heartland of the money laundering guideline can be characterized as constituting those transactions in which the laundered funds derived from serious underlying criminal conduct or in typical money laundering in which a defendant knowingly conducted a financial transaction to conceal tainted funds or funnel them into additional criminal conduct. *See Pierro,* 32 F.3d at 619–20; *Mustafa,* 238 F.3d 485 (3d Cir.2001). The activity

7. The Department of Justice has also issued its view on the scope of the money laundering statutes. In response to a Congressional inquiry, the Department noted that the money laundering statutes should not be used in cases where the money laundering activity is merely minimal or incidental to the underlying crime. *See* Department of Justice Report for the Senate and House Judiciary Committees on the Charging and Plea Practices of Federal Prosecutors with Respect to the Offense of Money Laundering, at 14 (June 17, 1996).

8. In the period since *Smith,* the Third Circuit has had other occasions to clarify its interpretation of what constitutes the heartland of the money laundering guideline. *See United States v. Mustafa,* 238 F.3d 485(3d Cir.2001); *United States v. Bockius,* 228 F.3d 305 (3d Cir.2000); *United States v. Cefaratti,* 221 F.3d 502 (3d Cir.2000). The interpretation set forth in these cases leads to the conclusion that *Smith* stands primarily for the proposition that rigid technicalities of the sentencing process must not overshadow the primary directive of the Guidelines—to harmonize the guideline with the specific offense conduct. *See id.* While the Court in these cases found that a departure based on *Smith* was not warranted, the facts surrounding the laundering in each of the matters went beyond the standard receipt-and-deposit case. *See id.* The present case more closely resembles the type of conduct that was the grounds for a departure in *Smith.*

associated with extensive drug trafficking operations is the exemplar of the kind of conduct falling within this heartland. *See Smith,* 186 F.3d at 290.

### C. The Unique of Nature of the Present Transactions

In determining the merits of the defendant's motion, this Court is confronted with a series of unique facts. The reason a court must labor over a heartland analysis is because, as the Commission has noted, there exists varying gradations in the type of money laundering violations. It is possible that a defendant's conduct may involve behavior which Congress sought to criminalize, but yet is distinct enough so as not to be at the core of the guideline's, or, for that matter, the statute's focus. In this matter, the defendant's conduct serves as an initial starting point for determining whether a departure is warranted. This specific pattern of conduct bears on perhaps the most important touchstone for undergoing a heartland analysis—the overall nature of the transactions involved in the money laundering offense.

At the outset, this case is distinct from virtually the entire panoply of cases construing the heartland of the money laundering guideline. Here the defendant did not engage in any underlying criminal conduct. In *Pierro,* the defendant's money laundering was accompanied by a conviction for conspiracy and for his participation in a racketeering enterprise in which proceeds from the sale of stolen property were used as security for bank loans. *See* 32 F.3d at 614. In *LeBlanc,* the defendant was convicted of money

laundering in connection with his acceptance and negotiation of checks from his involvement in an illegal gambling business. *See* 24 F.3d at 342. In *Mustafa,* the defendant's personal participation in mail fraud, food stamp fraud, and the making of false statements in obtaining a bank loan formed the nucleus of the money laundering conviction. *See* 238 F.3d 485. In the present matter, the money laundering itself was the only illegal activity either performed or contemplated by the defendant. The two transactions were not primarily intended to promote any other criminal enterprise, let alone transactions in the nature of large scale drug trafficking.[9] While these facts did not prevent a successful prosecution under the money laundering statute, they are significant in undertaking a heartland analysis. Although the Court of Appeals for the First Circuit in *Pierro* clearly stated that Congress meant the money laundering statute to address conduct undertaken subsequent to and apart from an underlying crime, the premise implicit in the Court's reasoning was that an underlying crime existed in the first place. *See* 32 F.3d at 620. Even in matters where a departure from the sentencing guideline, or choice of an alternative guideline to money laundering, has been found to be appropriate, such as in *Smith,* the defendant engaged in some underlying criminal conduct. *See e.g.* 186 F.3d at 290 (money laundering done incidental to an embezzlement/kickback scheme found not to be within heartland of guideline); *United States v. Ferrouillet,* 1997 WL 266627 (E.D.La.1997), *aff'd* 157 F.3d 347 (5th Cir.1998) (money laundering connected with the unlawful interstate

---

9. The facts indicate that Defendant Sidhom knew that the money to be laundered was purportedly drug related. It is well established that a defendant intends the natural consequences of his actions. While Sidhom may be said to have intended to bring about the natural consequences of his actions, the laundering of drug proceeds, such an implied intent does not change the fact that the nature of the transactions were not established as an undertaking by the defendant designed to promote extensive criminal activity.

transportation of property and the making of false statements to a federal agent found not to be within heartland of guideline); *United States v. Caba*, 911 F.Supp. 630, 634–37, *aff'd* 104 F.3d 354, 1996 WL 685764 (2d Cir.1996) (money laundering connected with food stamp violations found not to be within heartland, in that paper trail left by the defendant indicated his lack of intent to defraud the government). As such, the lack of any underlying crime in this matter committed by the Defendant Sidhom, or any intention by him to facilitate the flow of money into some underlying criminal enterprise, supports the ruling that this case falls outside of the heartland of the guideline.

This Court is cognizant of three distinct factors about the two transactions which make the defendant's dealings in this case atypical in the world of money laundering: (1) the defendant is involved in the legitimate business of check cashing; (2) there were only two isolated transactions which were not part of a continuing, extensive, or voluminous illegal money laundering enterprise; and (3) the laundering itself was motivated by a desire to perform a favor for another, and not to gain personal financial benefits for oneself.[10] From these three factors, the nature of the transactions can be seen as occupying the opposite end of the spectrum from the type of conduct usually associated with drug related laundering—the embodiment of the heartland of the guideline enforcing the money laundering offense.

Given the relevant authority defining the heartland of U.S.S.G. § 2S1.1(b)(2), Defendant Sidhom's case can be construed as a heartland case only under the theory of that term which focuses on a defendant's

intentional concealment of tainted funds. *See Pierro*, 32 F.3d at 619–20; *Mustafa*, 238 F.3d 485. First, this characterization of what constitutes the heartland of the offense cannot be detached from the reality that the usual case is one in which the concealment of the tainted funds is linked to some extensive criminal enterprise. The plain language of the money laundering statute, 18 U.S.C. § 1956(a)(3), has as an element the intent to conceal tainted funds. To suggest that the definition of what constitutes the heartland of the offense is *coterminous* with a *manner* in which the statutory elements could be satisfied would seem to circumvent the very necessity for any heartland analysis. A defendant who satisfies the statutory elements would necessarily have his case fall within the heartland without any discernment of the gradations in the different factual circumstances surrounding the money laundering transactions. In the present matter, the two transactions and the legitimacy of Sidhom's business point to the fact that the defendant was not engaged in any unlawful enterprise which would give him an incentive to funnel illegally gotten funds.

The particular circumstances surrounding the transfer of the funds also militate against the conclusion that the concealment fell within the heartland. The facts establish that Sidhom was motivated by the desire to assist Tejada on a personal level, and not to further Tejada's friend's alleged drug business. The illegal concealment was ancillary to this purpose. While Sidhom was aware, to his discredit, that alleged drug money was involved in the transactions, the record indicates that it was of no consequence to his decision to

---

10. The Government contends that the defendant's conduct was possibly motivated by his desire to forge a relationship with a drug dealer with the hope of carrying on future laundering activity, or even to support his own marijuana use. In light of Tejada's in-court testimony, this Court finds no basis for that proposition in the factual record.

provide assistance to Tejada. The defendant's motivation for conducting the transactions, regardless of their legality, was to assist Tejada and his wife in their financial difficulty. As the defendant suggests, this is clearly indicated by the fact that he did not seek to receive personal profit for his efforts and only reluctantly took the money forced on him by the undercover agent.[11]

The Court in *Ferrouillet* was faced with a similar task of addressing the heartland of the money laundering guideline. *See* 1997 WL 266627. In *Ferrouillet,* the Court focused on the conduct surrounding the transactions for which the defendant was convicted. *See id.* at *1–10. The matter before that Court was one in which the defendant was neither a drug dealer nor an organized crime member involved in a massive money laundering operation. Rather, the laundering transactions consisted of a business man and a lawyer attempting to make a $20,000 illegal campaign contribution and to conceal its source. *See id.* While the language of the money laundering guideline explicitly fits this offense, the Court concluded that the combination of the legislative history, the statistical evidence on the profile of the typical money launderer, the structure of the guideline, the pronouncements of the Commission, the Department of Justice's definition of the typical money laundering prosecution, as well as the lack of similar cases of this nature brought to prosecution all rendered the matter outside of the heartland of traditional money laundering cases. *See id.* As in the present matter, *Ferrouillet* did not involve laundering undertaken to legitimize a constant and voluminous flow of illegal income into the mainstream economy. *See id.* The money did not originate from some illegal activity, but was rather the proceeds of state funds. *See id.* Arguably, this case presents a stronger ground for departure than does *Ferrouillet,* in that there the money laundering was done to conceal the source of an illegal corporate check, whereas here the laundering was done as a result of a decision to assist an acquaintance suffering financial hardship by laundering money originating from the state police. *See id.*

The Government contends that the small number of transactions, the relatively low dollar value, and the fact that the money was not actually drug money do not, singly or in combination, justify a departure. This view is premised on the assertion that U.S.S.G. § 2S1.1(b), includes an enhancement provision where the amount of the laundering exceeds $100,000. In brief, the contention is that since Sidhom has not suffered an enhancement under this provision, any activity connected with the small number of transactions has already been taken into consideration. Such an argument neglects the basic premise of a heartland analysis, as well as the purpose behind the guideline's structure. The focus is on whether the present defendant's actions take the case out of the typical pattern of behavior for the offense charged. To say that any atypical conduct is already credited by the particular guideline is contrary to traditional heartland analysis. Moreover, the Government's invocation of the guideline's structure serves as a reminder that the fact that the base offense

---

11. Both the Government and the defendant argue over the significance of the fact that the defendant did not profit from his involvement in the money laundering scheme. While the Government is correct in stating that lack of personal profit does not itself establish a sufficient grounds for departure, this Court uses that fact to help its determination of what constitutes the overall nature of the transactions in question. *See United States v. Steele,* 178 F.3d 1230, 1238–40 (11th Cir.1999) (denying a departure, as "generally disfavored," where the defendant profited only $700 from drug sales).

level for U.S.S.G. § 2S1.1 begins at $100,000, and does not contemplate lower amounts, is indicative of the fact that these guidelines were intended primarily to apply to continuous large scale criminal operations involving sizeable amounts of money. *See Ferrouillet,* 1997 WL 266627.

In addition, this structure, coupled with the failed reform proposals of the Commission, indicates that certain mitigating circumstances associated with the standard receipt-and-deposit case are not present in the current money laundering guideline. As stated in *Skinner,* when such a situation is present, the Court has a greater ability to depart from the given guideline range. *See* 946 F.2d at 179. Moreover, there is an indication that the Commission had a willingness to incorporate the kind of atypical behavior present in this case into the guideline's structure. Therefore, as a departure based on the atypical conduct by the defendant and the unusual nature of the transactions would seem to be consistent with the wishes of the Commission, and thus a permissible ground for departure under *Koon. See* 518 U.S. at 95, 116 S.Ct. 2035

### D. The Sting Operation—18 U.S.C. § 1956(a)(3)

The Government contends that many of the unique characteristics of this case are a result of the fact that this matter was undertaken as a "sting operation." In particular, the argument is that cases brought under 18 U.S.C. § 1956(a)(3) will invariably have as the source of funds state money, as opposed to money derived from a criminal enterprise. As is the reasoning associated with the concealment aspect of the heartland analysis, establishing the statutory elements of an offense cannot by themselves create the typical heartland case. While the sting operation in the present case will undoubtedly cause the defendant to behave in a certain manner, or involve certain unique aspects, the nature of the transactions, as evidenced by the defendant's pattern of conduct, is the dispositive inquiry in determining the heartland of the guideline. This cannot be altered by prosecution under a particularized subsection of a statute.

The case of *United States v. Ellis,* cited by the Government, involved a sting operation related to the crime of money laundering. *See* 1997 WL 297080 (E.D.Pa.1997). There the defendant was convicted on two counts of, "engaging in a transaction with the intent to conceal or disguise the nature, location, source, ownership or control of property represented to be proceeds of drug trafficking in violation of 18 U.S.C. § 1956(a)(3)(B)." *Ellis,* 1997 WL 297080 at *6. The defendant's conviction is based on his having provided accounting services, corporate planning and tax preparation services for a sham corporation established by an IRS Special Agent. *See id.* As the Government points out, both Ellis and Sidhom received relatively modest financial gains for their services. The Court in *Ellis* noted, "the purpose of the sham corporation was to conceal [the agent's] purported drug proceeds." *Id.* While in the context of a sting operation and small compensation to the defendant, *Ellis* presents a wholly different set of factual circumstances than are present in Defendant Sidhom's case. The very purpose of the conduct undertaken by the defendant in *Ellis* was to conceal alleged drug proceeds. In contrast to Ellis, neither Sidhom himself, nor American Check Cashing, conducted their business affairs for the sole purpose of promoting illegal conduct.

### Conclusion

For the above reasons, the Court rules that the instant crime committed by Defendant Sidhom was not within the "heartland" of the offense of money laundering.

The usual manner in which this crime is committed is where the money laundering is integral to a large scale drug organization or other continuing, extensive illegal criminal enterprise and is the means whereby the proceeds from drug transactions or other extensive criminal activities are laundered. Defendant's Motion for a Downward Departure is allowed.

SO ORDERED