

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-2000

# United States v. Bockius

Precedential or Non-Precedential:

Docket 99-1973

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Bockius" (2000). *2000 Decisions*. Paper 204.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/204

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 25, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1973

UNITED STATES OF AMERICA,
        Appellant

v.

DAVID G. BOCKIUS

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 97-cr-00250-1
(Honorable Herbert J. Hutton)

Argued July 10, 2000

Before: SCIRICA, ALITO and FUENTES, Circuit Ju dges

(Filed: September 25, 2000)

        RICHARD W. GOLDBERG, ESQUIRE
        (ARGUED)
        WALTER S. BATTY, JR., ESQUIRE
        Office of United States Attorney
        615 Chestnut Street, Suite 1250
        Philadelphia, Pennsylvania 19106

         Attorneys for Appellant

          EDWARD C. MEEHAN, JR.,
          ESQUIRE (ARGUED)
          Hetznecker & Meehan
          1420 Walnut Street, Suite 911
          Philadelphia, Pennsylvania 19102

           Attorney for Appellee

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this appeal of a criminal sentence, we again address
the heartland of cases covered by U.S.S.G. S 2S1.1
(Laundering of Monetary Instruments).

David G. Bockius pled guilty to wire fraud, foreign
transportation of stolen funds, money laundering and
forfeiture. Citing United States v. Smith, 186 F.3d 290 (3d
Cir. 1999), the District Court declined to sentence Bockius
under the money laundering guideline U.S.S.G. S 2S1.1
because it believed the S 2S1.1 heartland includes only
money laundering associated with extensive drug trafficking
and serious crime. The government appeals, contending the
District Court misinterpreted Smith and adopted too narrow
a view of the heartland. Because Smith made clear the
heartland includes typical money laundering as well as the
money laundering activities connected with extensive drug
trafficking and serious crime, we will vacate the sentence
and remand.

I

The facts are undisputed. Bockius was the president and
one of four principals of Asset Protection Management, an
insurance brokerage firm in Blue Bell, Pennsylvania, when,
in the summer of 1995, he stole $600,000 from the
brokerage and its clients and fled to the Cayman Islands.1
_____

1. The exact amount is unclear. Bockius' Pre-Sentence Report states "the
total amount of money taken is this case is approximately $751,444.31."
P 13. At his original sentencing, the government contended the actual
loss was $800,000. The District Court sentenced him to pay restitution
of $581,500. Because the transactions described in record show that
Bockius took $600,500 from the Asset Protection Management account,
we will use the figure of $600,000 as an approximation of the "proceeds."

Asset Protection Management sold insurance to business clients. After collecting its clients' insurance premiums, it deposited them in an escrow, or "premium," account for payment to the insurance carriers. Most of Asset Protection Management's clients pay most of their premiums at the end of July.

On July 31 and August 2, 1995, Bockius wired $220,500 from the Asset Protection Management escrow "premium" account in Pennsylvania to his personal account at PaineWebber in New York. He then wired those funds to gambling casinos in Atlantic City, New Jersey. Bockius traveled to Atlantic City, lost some of the money gambling, and carried the rest of the cash back to Pennsylvania. On August 10, 1995, Bockius withdrew $380,000 in cash from the Asset Protection Management escrow "premium" account.

The next day, traveling under the name Louis Middleton, Bockius flew to the Cayman Islands with more than $500,000 in cash stashed in secret compartments in his suit cases. There, he formed a corporation called Little Mermaid Holdings and bought a house in the name of the corporation with part of the cash. Bockius intended to deposit the rest of the funds in Canadian banks in the Cayman Islands in deposits less than $10,000 to avoid reporting requirements, but asserts instead he formed a partnership with Claudio Helvester who soon stole the rest of his money.[2]

Asset Protection Management filed for bankruptcy. None of the money has been recovered.

Never far ahead of the authorities, but ostensibly willing to cooperate, Bockius turned himself in to the F.B.I. On July 16, 1997, Bockius pled guilty to three substantive charges: wire fraud, in violation of 18 U.S.C. S 1343; transporting the proceeds of fraud and theft between the United States and the Cayman Islands, in violation of 18 U.S.C. S 2314; and money laundering, in violation of 18 U.S.C. S 1956(a)(2)(B).[3] He conceded the stolen money was

_____

2. Helvester's role is not undisputed.
3. 18 U.S.C. S 1956(a)(2)(B) provides

   Whoever transports, transmits, or transfers, or attempts to

subject to forfeiture as a result of his money laundering under 18 U.S.C. S 982(a) and (b)(1).

The Pre-Sentence Report calculated Bockius' sentence using the money laundering guideline U.S.S.G. S 2S1.1. At

his sentencing on March 25, 1998, Bockius objected that his behavior fell outside the heartland of S 2S1.1. Denying his motion for a downward departure, the District Court sentenced Bockius to 48 months incarceration followed by four years supervised release, restitution of $581,500, and

a special assessment in the amount of $150.

No appeal was filed but, on September 24, 1998, having retained new counsel, Bockius filed a petition for habeas

corpus under 28 U.S.C. S 2255 alleging, among other things, ineffective assistance of counsel for failure to file an appeal on the heartland issue. See United States v. Bockius, No. 98-CV-5130 (E.D. Pa. June 25, 1999). On the recommendation of a Magistrate Judge, Bockius was resentenced on November 8, 1999.

At resentencing, the District Court held, under Smith, that Bockius' actions fell outside the heartland of the money laundering guideline and declined to sentence him under S 2S1.1. Employing the fraud guideline instead, the court sentenced Bockius to 36 months incarceration.

_____

transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or

transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part --

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law, [commits a criminal offense.]

4

Contending the money laundering guideline is appropriate, the government appeals.4

II

The District Court had jurisdiction under 28 U.S.C. S 2255. We have jurisdiction under 28 U.S.C.SS 1291 and 2253. The government was not required to seek a certificate of appealability in bringing its appeal. See Fed. R. App. P. 22(b)(3); Lambert v. Blackwell, 134 F.3d 506, 512 n.15 (3d Cir. 1998). We review the District Court's legal conclusions de novo. See United States v. Thomas, 221 F.3d 430, 433–34 (3d Cir. 2000). Application of the guidelines is a question of law reviewed under a plenary standard. See Smith, 186 F.3d at 297.

III

After hearing argument on the heartland issue, the District Court held:

> [Smith's] instruction to the district court . . . is best capsulized in page 10, next to the last paragraph there. It says and I quote from the opinion:
>
> "To use the money laundering guideline in this routine fraud case would let the tail wag the dog. Strict focus on the technicalities of the sentencing process obscures the over-arching directive to match the guidelines to the offense conduct which formed the basis of the underlying conviction."
>
> And they [the Third Circuit Court of Appeals] go on to say:
>
> "We are convinced that this case presents one of those anomalies that Congress intended the courts to deal with fairly. To fulfill this obligation--that obligation--we direct the use of the fraud guideline, rather than that for money laundering. Ultimately, we conclude that the sentencing Commission itself, has indicated that the heartland of the United States

_____

4. The court's decision to resentence Bockius has not been challenged.

Sentencing Guideline Section 2S1.1, is the money-laundering activity connected with extensive drug trafficking and serious crime."

And in that case of Smith, I conclude here, that that is not the type of conduct implicated here.

Tr. of Sentencing, App. 66-67 (quoting Smith, 186 F.3d at 300).

The government argues, and Bockius does not dispute, that the District Court declined to apply S 2S1.1 because it found that Bockius' conduct did not involve drug trafficking or serious crime. The government presents three arguments for the application of S 2S1.1 in this case: (1) under Smith, the heartland of S 2S1.1 includes typical money laundering; (2) Smith applies only to "atypical cases" and this is not an "atypical" case of money laundering; and (3) Bockius' international transportation of one half million dollars of embezzled funds is a serious crime.

Because we agree with the government's first argument, we need not reach its other two. The District Court read Smith to create a narrower heartland than warranted. Smith clearly contemplates applying S 2S1.1 to typical money laundering as well as to those activities "connected with extensive drug trafficking and serious crime." 5

_____

5. S 2S1.1. Laundering of Monetary Instruments

(a) Base Offense Level:

(1) 23, if convicted under 18 U.S.C. SS 1956(a)(1)(A), (a)(2)(A), or
(a)(3)(A);
(2) 20, otherwise.

(b) Specific Offense Characteristics

(1) If the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase by 3 levels.

(2) If the value of the funds exceeded $100,000, increase the offense level as follows . . . .

6

A

Money Laundering is a criminal offense under 18 U.S.C.
SS 1956 and 1957.

> Whoever, knowing that the property involved in a
> financial transaction represents the proceeds of some
> form of unlawful activity, conducts or attempts to
> conduct such a financial transaction which in fact
> involves the proceeds of specified unlawful activity . . .
> knowing that the transaction is designed in whole or in
> part . . . to conceal or disguise the nature, the location,
> the source, the ownership, or the control of the
> proceeds of specified unlawful activity, [violates
> S 1956(a)(1)(B)(i)].

Subsections (a)(2)(B), and (a)(3)(B) similarly forbid
transactions aimed at concealing or disguising proceeds.
Subsections 1956(a)(1)(A), (a)(2)(A) and (a)(3)(A) prohibit
promoting criminal activities.

Congress passed sections 1956 and 1957 as part of the
Money Laundering Control Act of 1986, Pub. L. No. 99-570,
100 Stat. 3207 (codified as amended at 18 U.S.C.SS 1956,
1957), "to `fill the gap in the criminal law with respect to
the post-crime hiding of ill-gotten gains.' " United States v.
LeBlanc, 24 F.3d 340, 346 (1st Cir. 1994) (quoting United
States v. Johnson, 971 F.2d 562, 569 (10th Cir. 1992).
Undoubtedly, Congress was intent on combating organized
crime.6 But that was not the sole purpose of the statute.7

_____

6. See, e.g., 132 Cong. Rec. S9626-04 (Senator Thurman stating
"[c]reation of a money laundering offense is imperative if our law
enforcement agencies are to be effective against the organized criminal
groups which reap profits" through money laundering); id. (Senator
DeConcini stating "[w]ithout the means to launder money . . . organized
crime could not flourish as it does now").

7. Senator DeConcini went on to observe "Money laundering techniques
are used by large legitimate businesses as well. The President's
commission discovered that American corporations, such as Gulf Oil,
Lockheed Aircraft, and McDonnell Douglas, have engaged in illegal
money laundering. Each corporation was involved in schemes to make
illegal payments to foreign government officials in order to win lucrative
overseas contracts. The broad array of groups participating in money
laundering illustrates how widespread the problem has become." Id.

By its text, S 1956 covers a broad array of behavior. Initiating, concluding or participating in the disposition of funds with the intent of concealing or disguising the nature of the funds or of promoting criminal activity may subject a person to prosecution if the funds are derived from any of a wide range of criminal activities. See 18 U.S.C. S 1956(c). We have previously noted that Congress intended to punish this use of criminally derived proceeds separately from and in addition to the criminal conduct which produced them. See United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994).8

In United States v. Smith, we recognized that the government's use of the money laundering statutes to sustain additional charges in criminal indictments, combined with the sentencing guidelines' penalties, created the possibility that money laundering could become a "dog-wagging tail." See 186 F.3d at 300. In Smith, use of the money laundering guideline, U.S.S.G. S 2S1.1, rendered a base offense level of twenty while use of the fraud guideline, U.S.S.G. S 2F1.1, would have rendered a base offense level of six. Where the gravamen of the conduct was fraud, we stated this disparity obscured "the overarching directive to match the guideline to the offense conduct which formed the basis of the underlying conviction." Smith, 186 F.3d at

_____

8. We have held that S 1956's prohibition on laundering proceeds obtained from a criminal offense applies only to funds from completed offenses, or completed phases of ongoing offenses. See Conley, 37 F.3d at 980. We have also held that crime is not "promoted" by depositing criminally derived proceeds in a personal account and using the money for personal needs. See id. at 979. When funds become "proceeds" and when they are used to "promote" may at times be difficult questions. In United States v. Paramo, 998 F.2d 1212 (3d Cir. 1993) (cited as consistent by Conley, 37 F.3d at 980), we upheld a verdict for violating S 1956(a)(1)(A)(i) by cashing checks received through mail fraud. The checks were made out to fictitious individuals. Because the violation of 18 U.S.C. S 1341 was completed when the checks were mailed, we held Paramo could reasonably be found to have promoted the antecedent fraud by "creating value out of an otherwise unremunerative enterprise." Id. at 1218. Therefore, although we have limited the scope of S 1956 to the proceeds of completed offenses (or phases of offenses), we have construed "promotion" and "completion" broadly. We understand the scope of U.S.S.G. S 2S1.1 to be less expansive.

8

300 (quoting United States v. Kuku, 129 F.3d 1435, 1440 (11th Cir. 1997)).

As noted in Smith, the Sentencing Commission has articulated similar concerns. In 1995, the Sentencing Commission concluded money-laundering sentences were being imposed for a broader scope of offense conduct than originally anticipated. See United States Sentencing Commission, Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report at 1, 5 (Sept. 18, 1997) ("Commission Report").

To address what it saw as sentencing disparities, the Sentencing Commission proposed amended "guideline penalties for money laundering offenses that were more proportionate to both the seriousness of the underlying criminal conduct . . . and to the nature and seriousness of the conduct itself." Id. at 1. But Congress rejected the amendments fearing their adoption would send a message "that money laundering associated with drug and other serious crimes is not viewed as the grave offense it once was." H.R. Rep. No. 104-272, at 14-15 (1995), reprinted in 1995 U.S.C.C.A.N. 335, 348-49. Despite rejecting the proposed amendments, Congress recognized "the application of the current guidelines to receipt-and-deposit cases, as well as to certain other cases that do not involve aggravated money laundering activity, may be problematic." Id.

Although Congress did not define "aggravated money laundering activity," the Sentencing Commission has described the guidelines' target conduct succinctly:

> 1) situations in which the `laundered' funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime; and, 2) situations in which the financial transaction was separate from the underlying crime and was undertaken to either: a) make it appear that the funds were legitimate, or b) promote additional criminal conduct by reinvesting the proceeds in additional criminal conduct.

Commission Report at 4.

9

Congress also solicited a report from the Department of Justice on money laundering enforcement practices. The report noted money laundering statutes are not appropriate "in cases where the money laundering activity is minimal or incidental to the underlying crime," but specifically stated the statutes should be used against white collar criminals. See Department of Justice Report for the Senate and House Judiciary Committees on the Charging and Plea Practices of Federal Prosecutors with Respect to the Offense of Money Laundering, at 2, 15 (June 17, 1996) (DOJ Report).

The foregoing discussion reinforces the view that, although Congress was concerned the guidelines might be too severe in punishing defendants who deposit or withdraw the proceeds of their crimes in or from banks, S 2S1.1 is intended to apply to defendants who knowingly conduct financial transactions apart from an underlying criminal offense to conceal that the proceeds involved are tainted. We held no differently in Smith.

B

Smith held that under Appendix A to the Guidelines manual, a sentencing court must engage in a two-step inquiry before applying a particular guideline section.

> 1. Does the designated guideline apply or is the conduct "atypical" in comparison to that usually punished by the statute of conviction; and
>
> 2. If the conduct is "atypical," which guideline is more appropriate?

Smith, 186 F.3d at 297 (citing United States v. Voss, 956 F.2d 1007, 1009 (10th Cir. 1992), superseded in part on other grounds by amendment to U.S.S.G. S 2D1.1)).

Atypical money laundering conduct is conduct outside the heartland of S 2S1.1. See Smith, 186 F.3d at 297–98. When deciding whether to apply the guideline, a court must undertake a heartland analysis "identical" to that employed when evaluating downward departures under U.S.S.G. Ch. 1, Pt. A, intro. comment. 4(b). Id. at 298.

Because at one point in the opinion Smith recited: "[u]ltimately, we conclude that the Sentencing Commission

10

itself has indicated that the heartland of U.S.S.G.S 2S1.1 is the money laundering activity connected with extensive drug trafficking and serious crime," Bockius contends his conduct falls outside the heartland of S 2S1.1. Id. at 300. This is a misinterpretation of Smith.

Analyzing the S 2S1.1 heartland, Smith reiterated the guideline targets set forth by the Sentencing Commission. Id. at 298. Smith also discussed the DOJ report, the proposed amendments and Congress's rejection of those amendments. See id. at 299. Smith makes clear that a court's S 2S1.1 heartland analysis should address whether defendants engaged in money laundering in which"the `laundered' funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime' " or in typical money laundering in which a defendant knowingly conducted a financial transaction to conceal tainted funds or funnel them into additional criminal conduct. Id. at 298.

Smith concluded the defendants should not have been sentenced under S 2S1.1 because neither the source of the funds nor the nature of the money laundering brought the defendants' conduct within the heartland of that guideline. The defendants "left a paper trail, conduct inconsistent with planned concealment"; the "money laundering activity . . . was an `incidental by-product' of the kickback scheme" and "Smith's disingenuous efforts towards a cover-up[fell] far short of the large scale drug money laundering or serious crime contemplated by the Sentencing Commission." Id. at 300.

Other Courts of Appeals have drawn similar distinctions -- establishing the heartland of the money laundering guidelines is narrower than the inclusive scope of the money laundering statutes but declining to limit the guidelines' scope to drug trafficking and organized crime.[9] See United States v. Ross, 210 F.3d 916, 928 (8th Cir. 2000) (reversing departure but allowing that on remand, "court may find Ross' case presents additional unique or

_____

9. But see United States v. Adams, 74 F.3d 1093, 1101 (11th Cir. 1996) (where defendants found guilty of violating 18 U.S.C. S 1956, U.S.S.G. S 2S1.1 must be applied).

atypical features that take it outside the money laundering guideline heartland similar to those in [Smith]"); United States v. Prince, 214 F.3d 740, 768 (6th Cir. 2000) (application of S 2S1.1 proper where defendants attempted to conceal proceeds of wire fraud); United States v. Ford, 184 F.3d 566, 587-88 (6th Cir. 1999) (affirming refusal to depart from U.S.S.G. S 2S1.2 but noting other courts had affirmed departures "based in part on the fact that the underlying offenses, though literally within the statute, were not drug-trafficking, `organized crime',`serious money-laundering', or `unusually severe fraud,' " and implying departure might be appropriate where money laundering created no additional societal harm); United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998) (affirming heartland departure from S 2S1.2 because depositing funds in a personal account and obtaining cashier's checks to pay personal bills did not constitute "serious money-laundering conduct"); United States v. Hemmingson, 157 F.3d 347, 363 (5th Cir. 1998) (acknowledging S 2S1.1 may be applicable outside of organized crime and drug trafficking but affirming heartland departure because "defendants were not seeking to legitimize a stream of illegal income into the mainstream economy [nor to launder] . . . drug proceeds, or proceeds from some other unlawful activity."); United States v. Skinner, 946 F.2d 176, 177 (2d Cir. 1991) (holding district court could depart from the guideline whereS 1956 violation rested solely on payments by drug dealer to her supplier because payments did not "conceal a serious crime" and promotion of the sale was de minimus (as the transaction represented only completion of the sale)); see also United States v. Caba, 911 F. Supp. 630, 636 (E.D.N.Y. 1996), aff 'd, 104 F.3d 354 (table) (if defendant's "actions were part of a classic money laundering scheme designed to conceal . . . sullied monies, . . . the more punitive money laundering guideline would be appropriately used to determine punishment," but absent such a finding downward departure was required where funds were not from drug trafficking).

C

In view of this discussion, we will vacate Bockius' sentence and remand for resentencing. After embezzling

12

$600,000, Bockius admitted engaging in several acts to conceal the illegal source of the money and his ownership. After wiring funds from Asset Protection Management's escrow "premium" account to an account in New York, he wired them a second time to casinos where he converted them into cash. In violation of 18 U.S.C. S 1956(a)(2)(B), he secretly carried the cash or proceeds to the Cayman Islands where he formed a corporation under a false name, planned on depositing the money in bank accounts under different names in amounts calculated to avoid reporting requirements and bought a house in the name of the Little Mermaid corporation. Moreover, he claims the remainder of the funds was stolen by a person to whom he planned to give his money in an attempt to make it untraceable. These actions appear to constitute typical money laundering.

IV

As noted in Smith, on remand the District Court should engage in a heartland analysis before applying the money laundering guideline. Where money laundering is not "minimal or incidental," and is "separate from the underlying crime" and intended to "make it appear that the funds were legitimate" or to funnel the money into further criminal activities, S 2S1.1 is an applicable guideline. The guideline may also be applicable if there is evidence that the activities which fulfilled the broad statutory requirements for money laundering were connected with extensive drug trafficking or other serious crime. Although the application of the correct guideline is a question of law, the District Court may be required to make factualfindings to resolve these underlying issues.

V

Here, the District Court found Bockius was not involved with extensive drug trafficking nor other serious crime. Because the court did not address Bockius' typical money laundering, we will vacate the judgment of the District Court and remand for resentencing.

13

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit