### UNITED STATES of America

### v.

### Jameel JORDAN, Defendant.

### No. CR. A. 99–643.

United States District Court,
E.D. Pennsylvania.

Feb. 7, 2001.

Kristin R. Hayes, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

David M. Kozlow, Federal Defenders Association, Philadelphia, PA, for Defendant.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

This case involves the illegal exchange of cash for food stamps, which are government benefits issued by the United States Department of Agriculture to help low-income individuals buy food.

### I. Background

On May 22, 2000, defendant Jameel Jordan entered a guilty plea to Count One of the indictment, charging conspiracy to commit food stamp access device fraud in violation of 18 U.S.C. § 371[1], and Count Eight of the indictment, charging money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).[2] Mr. Jordan also agreed not to contest the notices of forfeiture filed pursuant to 7 U.S.C. § 2024(h)(2) and 18 U.S.C. § 982(a)(1) and (b)(1). *See* Plea Agreement at ¶ 1.

The factual background of this case is simple. Mr. Jordan operated a produce truck and a deli/grocery, which were equipped with USDA-approved machinery enabling food stamp recipients to electronically transfer their food stamp funds directly into Mr. Jordan's bank account. *See* Indictment at 2–4 ¶¶ 2–8. The fraud consisted of transactions whereby a food

**1.** 18 U.S.C. § 371 states, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." The object of the conspiracy was to commit offenses in violation of 7 U.S.C. § 2024(b), which governs the unauthorized use, transfer, acquisition, or possession of food stamp coupons, authorization cards, or access devices. *See* Indictment at 4 ¶ 8.

**2.** At the time of the offense, the relevant portion of 18 U.S.C. § 1956(a)(1)(A)(i) provided that

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
(A)(i) with the intent to promote the carrying on of specified unlawful activity; ... shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.
18 U.S.C. § 1956(a)(1)(A)(i) (1998) (amended 2000).

stamp recipient would transfer stamp funds to Mr. Jordan, and, in return, Mr. Jordan would give the recipient 50 to 60 cents on the dollar, rather than giving them food. During the relevant 19–month period, Mr. Jordan accumulated a total of approximately $665,000 in food stamp funds in his bank account, approximately $399,000 of which had been obtained through such fraudulent transactions. *See* Indictment at 4 ¶ 10. Mr. Jordan also withdrew a total of more than $200,000 from his account via checks made payable to cash,[3] constituting money laundering.

## II. Discussion

The principal question raised at sentencing[1] pertains to the initial choice of guidelines to be used in calculating Mr. Jordan's offense level. The government seeks the application of the money laundering guidelines, U.S.S.G. § 2S1.1 (1999), and the defendant seeks the application of the fraud guidelines, U.S.S.G. § 2F1.1. As discussed below, the fraud guidelines are appropriate in this case. Mr. Jordan has also requested a downward departure based on extraordinary civic, public or charitable service pursuant to U.S.S.G. § 5H1.11. The court declines to grant a departure on such grounds. Finally, Mr. Jordan seeks an additional one-point reduction to his offense level pursuant to U.S.S.G. § 3E1.1(b). The court grants this request.

### A. Initial Choice of Guidelines Pursuant to U.S.S.G. § 1B1.2(a) (1998)

#### 1. Controlling Guidelines

As a preliminary matter, the court must determine whether to apply the Guidelines in effect at the time of the offense or those in effect at the time of sentencing, as some of the relevant guidelines have been amended since the offense was committed.[5] In this case, the court

---

3. Count Eight of the indictment, the only count of money laundering to which Mr. Jordan pled guilty, pertains to a single check written by Mr. Jordan in the amount of $400.00 and made payable to a vendor. *See* Indictment at 10 ¶ 3. Pursuant to the plea agreement, at the sentencing hearing on February 6, 2001 the government dismissed all counts of money laundering charged in the indictment other than Count 8. Plea Agreement at ¶ 6(a). However, the plea agreement stipulates that "for the purposes of determining the defendant's Sentencing Guidelines range," certain of those additional money laundering counts would be treated as if the defendant had been convicted of those offenses. *Id.* at ¶ 10(a) (citing U.S.S.G. § 1B1.2). Each of those additional counts pertains to a separate check written by Mr. Jordan and made payable to cash, the total amount of which is more than $200,000. *See* Indictment at 10–15 ¶ 3.

4. Mr. Jordan's sentencing hearing was previously scheduled for October 19, 2000. During that hearing, Mr. Jordan expressed to the court that he did not fully understand the terms of his plea agreement. Tr. at 37, lns. 7–20 (filed Jan. 8, 2001). Mr. Jordan requested a continuance of the sentencing proceedings and appointment of new counsel, and the court granted both requests. *See* Order of October 19, 2000 (appointing counsel). The rescheduled sentencing hearing, at which Mr. Jordan was represented by new counsel, was held on February 6, 2001.

5. The relevant amendments are those to Sections 1B1.1 and 1B1.2 and the introduction to Appendix A that were put into effect November 1, 2000. *See* U.S.S.G. app. C at 32 (Supp.2000). Whether a sentencing court is bound by a subsequent amendment first depends on whether the amendment is a clarifying amendment or a substantive change to the guidelines. *United States v. Mustafa*, 238 F.3d 485, 496 (3d Cir.2001). The Third Circuit has left open the question of whether the amendments at issue in this case are substantive or clarifying. *See id.* There is no bright line test for making this determination, but rather, the "categories are unclear" and it is "usually the case [that] there are factors supporting either side." *See United States v. Roberson*, 194 F.3d 408, 417 (3d Cir.1999) (citation, punctuation omitted). Considerations include whether, as a matter of construction, the guideline and commentary in effect at that time is really consistent with the amended manual, and whether the amendment resolves an ambiguity in the guideline or commentary. *Id.* In *Roberson*, the Third Circuit stated that because the amendment at issue in that case "overruled [its] prior construction of the guideline," the court was "inclined to hold that it effected a substantive change." *Id.* (citation omitted). Similarly, in light of the amendments at issue in this case, the "contin-

applies the 1998 version of the Sentencing Guidelines, put into effect November 1, 1997, pursuant to *U.S. v. Corrado*, 53 F.3d 620, 622–23 (3d Cir.1995). *Corrado* stated that

> [a]s a general rule, a defendant's sentence should be based on the guidelines that are in effect on the date that the defendant is sentenced. When, however, the retroactive application of the version of the guidelines in effect at sentencing results in more severe penalties than those in effect at the time of the offense, the earlier version controls, since ... to apply a change in the guidelines that enhances the penalty would offend the ex post facto clause of the United States Constitution. Moreover, if the application of the guideline manual in effect at the time of sentencing would violate the ex post facto clause, the manual in effect on the date of the offense should be used in its entirety.

*Id.* (punctuation, citations omitted). In this case, the Guidelines in effect at the time of sentencing, *i.e.*, those effective as of November 1, 2000, would result in the application of U.S.S.G. § 2S1.1, the money laundering guidelines.[6] In contrast, the version of the Guidelines effective at the time of the offense[7] requires the sentencing court to first make an initial choice of the guideline "most applicable to the offense of conviction," U.S.S.G. § 1B1.2(a) (1998) (amended 2000), and would result in the application of fraud guidelines as discussed subsequently. *See infra* Part II. A.2. Therefore, the guidelines in effect at sentencing would mandate more severe penalties that the guidelines in effect at the time of the offense,[8] and under *Corrado*, the earlier version controls. *Corrado*, 53 F.3d at 622–23.

### 2. Choice of Fraud Guidelines or Money Laundering Guidelines

In determining the initial choice of guidelines pursuant to U.S.S.G. §§ 1B1.1(a) and 1B1.2(a)[9], the Third Circuit required the application of the fraud guidelines where the defendant engaged in both fraud and money laundering, but where the money laundering activities were merely "an incidental by-product" of

ued relevance" of precedent applying the earlier version of the guideline (and relied on subsequently in this opinion) is now "open to question." *Mustafa*, 238 F.3d 485, 496 (citing *United States v. Smith*, 186 F.3d 290, 300 (3d Cir.1999)). In this case, the court views the amendments at issue as substantive.

6. Under the Guidelines currently in effect, the court determines the guideline applicable to offense by reference to the Statutory Index (app.A), or, in the case a statute not listed in the Index, by choosing "the most analogous" guideline, pursuant to section 2X5.1. *See* §§ 1B1.1(a) and 1B1.2(a). The Statutory Index applies section 2S1.1, the money laundering guidelines, to offenses charged under 18 U.S.C. § 1956. U.S.S.G. app. A. The Index specifies no guideline for offenses charged under the food stamp fraud statute, 18 U.S.C. § 371, and therefore section 2F.1.1, applicable to fraud, would apply as "the most analogous" guideline. The fraud and money laundering offenses would then be grouped under section 3D1.1 and either section 3D1.2(b) or 3D1.2(d) and cmt. n. 6, resulting in the application of the money laundering guidelines because those guidelines impose a higher offense level than the fraud guidelines. *See* U.S.S.G. § 3D1.3. Thus, under the version of

the guidelines in effect at time of sentencing, the money laundering guidelines would apply.

7. The November 1, 1997 version of the Guidelines was in effect at the time of the offense. *See* Indictment at 4 ¶8, 10 ¶3 (Count One, charging conspiracy to commit food stamp fraud in or about March 1, 1998 to in or about September 30, 1999, and Count Eight, charging money laundering committed on March 2, 1998).

8. Considering the base offense level and specific offense characteristics alone, the application of U.S.S.G. § 2S1.1(a) and (b)(2)(C) (2000) would result in an offense level of 22 since the loss is more than $200,000 but not more than $350,000; the application of U.S.S.G. § 2F1.1(a) and (b)(1)(J) (1998) would result in an offense level of 15 since the loss is more than $350,000 but not more than $500,000.

9. In *Smith*, the court applied the 1997 version of the Guidelines, which is in relevant part identical to the 1998 version applied in this case. *Smith*, 186 F.3d at 297.

the principal crime of fraud. *United States v. Smith*, 186 F.3d 290, 300 (3d Cir.1999). In *Smith*, a consulting firm deliberately overcharged its client and paid kickbacks to defendant Smith, an employee of the client company who ensured that the client continued to give business to the consulting firm. *Id.* at 294. A portion of the kickbacks to Smith were paid via 15 checks written by the consulting company and made directly payable to Smith's creditors, *id.* at 293, which technically constituted money laundering because the arrangement was an attempt, albeit a transparent one, *id.* at 298, to conceal Smith's direct participation in the transactions. In reversing the district court's application of the money laundering guidelines and remanding the case for resentencing under the fraud guidelines, the Third Circuit cited the Guidelines' acknowledgment that the guideline ordinarily applied to the statute of conviction may sometimes be " 'inappropriate because of the particular conduct involved,' " and that in such "atypical" cases, the court should use the guideline " 'most applicable to the nature of the offense conduct charged.' " *Id.* at 297 (quoting U.S.S.G. app. A (1997)). The court then analyzed the history of the money laundering statute and guidelines, emphasizing reports stating the Sentencing Commission's and Department of Justice's concerns about the overbroad application of the money laundering statute. *Id.* at 298–300. The *Smith* court ultimately concluded that the kickback scheme before it constituted "routine fraud," of which the money laundering conduct was a mere "incidental by-product," and that therefore the defendant's conduct did not fall within the heartland of money laundering. *Id.* at 300.

■ Although *Smith* emphasized that the Sentencing Commission focused the application of the money laundering guidelines on activity connected with extensive drug trafficking and serious crime, *id.*, the Third Circuit has since clarified that the money laundering guidelines do not apply

*exclusively* to drug and organized crime cases. *See United States v. Bockius*, 228 F.3d 305, 312–13 (3d Cir.2000) (remanding embezzlement case where the district court failed to inquire whether the defendant engaged in "typical money laundering," but rather inquired merely whether the defendant engaged in extensive drug trafficking or other serious crime). The relevant inquiry when making the initial choice of guidelines is thus whether the defendant's conduct falls within the "heartland" of the money laundering guideline, that is, a set of typical cases embodying the conduct targeted by the guideline. *Smith*, 186 F.3d at 297–98; *see also Bockius*, 228 F.3d at 312–13; U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b). The heartland analysis at this stage of the sentencing process is identical to that which occurs in the context of a departure request. *Smith*, 186 F.3d at 298; *see also Koon v. United States*, 518 U.S. 81, 93–94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

■ In conducting a heartland analysis of money laundering conduct, a court should consider whether the defendant 1) laundered funds "derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime," and 2) engaged in financial transactions "separate from the underlying crime" undertaken either to "a) make it appear that the funds were legitimate or b) to promote additional criminal conduct by reinvesting the funds in additional criminal conduct." *Smith*, 186 F.3d at 298 (citing U.S. SENTENCING COMMISSION, REPORT TO CONGRESS: SENTENCING POLICY FOR MONEY LAUNDERING OFFENSES, INCLUDING COMMENTS ON DEPARTMENT OF JUSTICE REPORT at 4 (Sept. 18, 1997)); *see also Bockius*, 228 F.3d at 311 (same).

■ As to the first consideration, whether the laundered funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime, the court finds that the underlying criminal conduct in this case,

which consisted of simple exchanges of cash for food stamps, is not the type of crime contemplated by the Commission as appropriate for sentencing under the money laundering guidelines. *See Smith,* 186 F.3d at 300 (finding that "routine fraud" involving a consulting firm that overcharged its client was not the type of crime contemplated by money laundering guidelines). Although the court does not wish to downplay the gravity of food stamp fraud, it cannot agree that the simple and straightforward crime at issue in this case is as serious as the representative examples of significant drug operations or organized crime. *Cf. United States v. Edwards,* 2000 WL 1277930, at *3 & n. 6 (E.D.Pa. Sept.7, 2000) (applying money laundering guidelines to "serious crime" involving three bank fraud conspiracies centered around stolen and counterfeit checks).

The second consideration is whether Mr. Jordan engaged in financial transactions separate from the underlying crime undertaken either to a) make it appear that the funds were legitimate or b) promote additional criminal conduct. First, the court finds that there were no transactions undertaken in this case to conceal the illegitimate nature of the funds.[10] Mr. Jordan had the food stamp recipients deposit the funds into his regular business bank account, and he subsequently withdrew the funds from that account using checks made payable directly either to vendors or to cash. *Cf. Bockius,* 228 F.3d at 313 (applying money laundering guidelines where defendant wired criminal proceeds through bank and casino accounts, fled to the Cayman Islands and invested proceeds under false names in banks, real estate and a false corporation); *United States v. Bifield,* 42 F.Supp.2d 477, 483–84 (M.D.Pa. 1999) (applying money laundering guidelines where defendants concealed fraudulent tax return proceeds through a variety of financial transactions); *United States v.*

*Arnold,* 2000 WL 288242, at *4–5 (E.D.Pa. Mar.20, 2000) (applying money laundering guidelines where defendant concealed stolen money by laundering it through two bank accounts).

Next, the court considers whether Mr. Jordan engaged in separate financial transactions to promote additional crimes. Mr. Jordan withdrew over $200,000 from his account through checks made payable to cash. The clear inference, according to the government, is that this cash was immediately reinvested into further cash-for-stamps transactions, thus promoting additional crimes. *See* Govt.'s Sentencing Mem. at 3 (filed October 12, 2000). The leading case in the Third Circuit on the choice of guidelines where the defendant promoted additional criminal conduct is *United States v. Cefaratti,* 221 F.3d 502 (3d Cir.2000), in which the Third Circuit upheld the sentencing court's application of the money laundering guidelines.

In *Cefaratti,* the defendant ran a cosmetology school whose eligibility for government student loan funds was at risk due to high default rates. *Id.* at 505. To lower those rates, Cefaratti submitted false loan applications and forbearance forms to the government on behalf of defaulting students and directed his staff to take numerous steps to obscure this wrongdoing. *Id.* He explicitly confessed to certain money laundering activities, such as using the fraudulently-obtained school loan funds to "continue the frauds in which [he] was engaged," and to build an addition to the school. *Id.* at 511, 515. Cefaratti also admitted to paying loans on behalf of defaulting students, and the court noted that he did not argue that the ill-gotten gains were not used for this purpose. *Id.* at 505, 515. In light of these activities, *Cefaratti* held that the district court's application of the money laundering guidelines was not plain error. *Id.* at 514.

The court does not find that *Cefaratti* mandates application of the money laun-

---

10. Mr. Jordan was not charged under the portion of the statute that pertains to conceal-

ment, 18 U.S.C. § 1956(a)(1)(B). *See* Indictment at 15 ¶ 5.

dering guidelines in this case. First, the defendant in *Cefaratti* did not simply finance the existing scheme; rather, he reinvested the funds in an addition to the school, which permitted an increase in enrollment and affirmatively expanded the opportunity for further crimes, and also created an even greater need for fraud by enlarging the scope of the activities supported by fraud. Thus, the laundering conduct in *Cefaratti* enhanced and expanded the fraud-and-laundering cycle. In contrast, Mr. Jordan's laundering consisted of the simple use of the criminal proceeds to continue fraud, which neither created additional liabilities compelling extended crime nor enhanced the opportunities for such crime.

Second, and more significantly, the Third Circuit has emphasized that "[w]here the gravamen of the conduct [is] fraud," applying the money laundering guidelines creates a sentencing disparity that would "obscure[ ] the overarching directive to match the guideline to the offense conduct which formed the basis of the underlying conviction." *Bockius*, 228 F.3d at 310 (citations, punctuation omitted). Therefore, a sentencing court must consider the context in which the money laundering took place and its relative significance to the criminal undertaking. In *Smith*, the court's decision to apply the fraud guidelines turned on its finding that the defendant's principal crime was cheating his employer, and that his money laundering activities were, "when evaluated

against the entire course of conduct[,] . . . an incidental by-product" of the central fraud. *Smith*, 186 F.3d at 300 (punctuation omitted); *see also Cefaratti*, 221 F.3d at 514 (describing *Smith* as a case where the "overarching offense" was fraud, even though the money laundering conduct was "technically a violation" of the money laundering statute). Similarly, in this case, Mr. Jordan's principal crime was cheating the government, and his laundering activities were merely incidental to his central offense of fraud.[11] *Cf. United States v. Friday*, 2000 WL 1618472, at *2 (E.D.Pa. Oct.26, 2000) (finding money laundering conduct not incidental to food stamp fraud, where defendant concealed the fraud by employing multiple bank accounts and credit cards, commingling proceeds, maintaining sham accounts, and frequently transferring substantial sums of money). The defendant shall be sentenced accordingly.

### B. Departure Based on Extraordinary Civic, Public, or Charitable Activities, Pursuant to U.S.S.G. § 5H1.11

A court may depart downward from the applicable guideline range if it finds "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. A court must first determine whether the departure factor is forbidden, discouraged, or unmentioned by the Guidelines. *See*

---

11. The court further notes that in *Cefaratti*, the defendant explicitly admitted to the use of the ill-gotten proceeds to continue his frauds and expand the school. *Cefaratti*, 221 F.3d at 511, 515. In this case, the extent to which the defendant actually used the funds to promote further fraud is considerably less clear. As noted previously, Mr. Jordan pled guilty to one count of money laundering and stipulated that other counts pertaining to more than $200,000 withdrawn by checks made out to cash would be considered for the purposes of determining his sentencing range. Plea Agreement at 4 ¶ 10. However, at his original sentencing hearing, Mr. Jordan expressed that he did not understand the concept of

"merging" of these additional counts of money laundering into the one count to which he plead guilty. Tr. at 37, lns. 7–20. The defendant, through current counsel, has not subsequently challenged that provision of his plea agreement, nor he does dispute that the full amount withdrawn in the form of cash was reinvested in the manner argued by the government. Thus, Mr. Jordan's apparent misunderstanding of the significance of the total amount of funds "laundered" to his sentence is explicitly not a basis for the court's application of the fraud guidelines. However, the court notes that due to these unusual circumstances, it especially reluctant to apply the money laundering guidelines in this case.

*Koon,* 518 U.S. at 94–96, 116 S.Ct. 2035; *United States v. Iannone,* 184 F.3d 214, 226–27 (3d Cir.1999) (detailing 5K2.0 departure analysis to be employed after *Koon* ); *United States v. Sally,* 116 F.3d 76, 80 (3d Cir.1997) (same). If the factor is discouraged, encouraged but already taken into the account by the applicable guideline, or listed as an appropriate consideration in applying an adjustment, a court can depart "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon,* 518 U.S. at 96, 116 S.Ct. 2035. A defendant's military, civic, charitable, or public service, his employment-related contributions, and his record of prior good works are a discouraged factor. *See* U.S.S.G. § 5H1.11. The defendant has the burden of production and persuasion on a request for downward departure. *United States v. Higgins,* 967 F.2d 841, 846 n. 2 (3d Cir.1992).

A dozen letters were submitted to the court on behalf of Mr. Jordan, detailing his financial contributions to several charitable organizations; his compassion and emotional and financial support for his severely disabled uncle and his late mother; his generosity in providing food, store credit, or a helping hand to community members in need; and his willingness to serve as a mentor and role model for youth in his neighborhood. The defendant cites *United States v. Serafini,* 233 F.3d 758 (3d Cir.2000) in support of its motion for a downward departure under U.S.S.G. § 5H1.11, emphasizing that unlike the defendant in that case, who received a downward departure based in part on his financial contributions to individuals as well as charitable organizations, Mr. Jordan is not a wealthy man. The court is aware of the Third Circuit's admonition that a district court "must not run afoul of the prohibition against considering socioeconomic differences in relying on financial contributions as a basis for a departure." *Id.,* 233 F.3d at 774. However, the court finds that Mr. Jordan's civic, charitable, and public service and other good works, while commendable, are not so exceptional or extraordinary for a person in Mr. Jordan's circumstances as to warrant a downward departure. *See Koon,* 518 U.S. at 96, 116 S.Ct. 2035; *see also United States v. Ellis,* 1997 WL 297080, at \*5 (E.D.Pa. May 22, 1997) (denying departure although it was "apparent" from the numerous letters received by the court that the defendant was "extensively involved in the community").

## C. Reduction By One Point Pursuant to U.S.S.G. § 3E1.1

The two-point reduction in the defendant's offense level pursuant to U.S.S.G. § 3E1.1(a) for the acceptance of responsibility is not contested. However, the defendant also seeks an additional one-point reduction pursuant to U.S.S.G. § 3E1.1(b). The court finds that the defendant timely provided complete information to the government concerning his own involvement in the offense, and that the defendant's base offense level is more than 16.[12] *See* U.S.S.G. § 3E1.1(b)(1). Therefore, Mr. Jordan qualifies for the additional one-point reduction under U.S.S.G. § 3E1.1(b)(1).

## III. Conclusion

The court applies the 1998 version of the Sentencing Guidelines, which were in effect at the time of the offense, as required under *U.S. v. Corrado,* 53 F.3d at 622–23. As a matter of the initial choice of guidelines, the court finds that the fraud guidelines apply, for the reasons previously discussed. U.S.S.G. § 2F1.1. While the court

---

**12.** The base offense level is six. *See* U.S.S.G. § 2F1.1(a). The amount of loss is approximately $399,000, qualifying for nine additional levels. *See* U.S.S.G. § 2F1.1(b)(1)(J) and cmt. n. 7(d) (stating that "[i]n a case involving diversion of government benefits, loss is the value of the benefits diverted from intended recipients or uses"). The defense concedes that the offense involved more than minimal planning, resulting in the addition of two levels, *see* § 2F1.1(b)(2), for an offense level of 17 prior to the operation of U.S.S.G. § 3E1.1.

recognizes that it has the discretion to depart from the Sentencing Guidelines under U.S.S.G. §§ 5K2.0 and 5H1.11, it will not do so in this case because the defendant's civic, charitable, and public service and record of prior good works, while laudable, are not extraordinary. Finally, the court grants the defendant's request for an additional one-point reduction pursuant to U.S.S.G. § 3E1.1(b)(1).

An appropriate Order follows.

## ORDER

**AND NOW,** this 7th day of February, 2001, upon consideration of the Defendant's Sentencing Memorandum and Motion for Downward Departure (doc. 29), the Government's Sentencing Memorandum (doc. 25), and after a sentencing hearing, it is hereby **ORDERED** as follows:

1. For the reasons set forth in this court's Memorandum of even date, the court applies the fraud guidelines in sentencing the defendant. U.S.S.G. § 2F1.1 (1998).

2. The defendant's motion for a downward departure pursuant to U.S.S.G. § 5H1.11 is **DENIED.**

3. The defendant's request for an additional one-point reduction pursuant to U.S.S.G. § 3E1.1(b)(1) is **GRANTED.**

4. Accordingly, the defendant's Presentence Investigation Report (PSI) shall be modified as follows:

   a. PSI ¶¶ 5, 28, and all other references to the Sentencing Guidelines are modified to reflect the application of the 1998 version of the Sentencing Guidelines, effective November 1, 1997.

   b. PSI ¶ 27 is modified to reflect a three-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1.

   c. PSI ¶ 30 is deleted.

   d. PSI ¶¶ 31–38 are modified to reflect the following calculations: a base offense level of 6, see U.S.S.G. § 2F1.1(a); a specific offense characteristic increase of 9 levels based on loss in the amount of $399,000, see U.S.S.G. § 2F1.1(b)(1)(J); an increase of 2 levels based on the involvement of more than minimal planning, see U.S.S.G. § 2F1.1(b)(2)(A); and a total decrease of 3 levels based on the acceptance of responsibility, encompassing a 2–level decrease pursuant to U.S.S.G. § 3E1.1(a) and an additional 1–level decrease pursuant to U.S.S.G. § 3E1.1(b)(1). The total offense level is 14.

   e. PSI ¶ 76 is modified to reflect a total offense level of 14 and a criminal history category of I, resulting in a Guideline range for imprisonment of 15–21 months.

   f. PSI ¶ 85 is modified to reflect a fine range from $4,000 to $40,000. See U.S.S.G. § 5E1.2(c)(3).